THE UNION STEAMSHIP COMPANY OF PHILADELPHIA, CLAIMANTS AND OWNERS OF THE STEAMSHIP PENNSYLVANIA, HER TACKLE, &C., APPELLANTS, *v.* THE NEW YORK AND VIRGINIA STEAMSHIP COMPANY.

In a collision which took place in Elizabeth river, in 1855, between the steamship Pennsylvania and the steamship Jamestown, the Pennsylvania was in fault, and the collision cannot be imputed to inevitable accident.

Inevitable accident must be understood to mean a collision which occurs when both parties have endeavored, by every means in their power, with due care and caution and a proper display of nautical skill, to prevent the occurrence of the accident.

If the night was very dark, it was negligence in the master of the Pennsylvania to remain in the saloon until just before the collision occurred; and if the night was not unusually dark, there was gross negligence in those who had the management of the deck.

The helm of the Pennsylvania was put to starboard when it ought not to have been, and the supposition that she was backing is shown not to have been correct by the force with which she struck the other vessel, which had taken every precaution to avoid the danger.

THIS was an appeal from the Circuit Court of the United States for the eastern district of Virginia, sitting in admiralty.

It was a case of collision which occurred between the steamship Jamestown and the steamship Pennsylvania, the libel

being filed by the owners of the former. The collision took place some few miles below the port of Norfolk, in Virginia, under circumstances which are freely stated in the opinion of the court.

The District Court decreed in favor of the libellants, and assessed the damages at $1,893.08, with interest from 1st of February, 1855, till paid, and the Circuit Court affirmed the decree.

Upon an appeal to this court it was submitted on printed argument by *Mr. Kane* for the appellants, and argued by *Mr. Watson* for the appellees.

*Mr. Kane* contended that the evidence justified the conclusion that the collision was the result of inevitable accident, arising from the intense fog which had settled upon the Elizabeth river, which position was denied by *Mr. Watson.* The arguments could not be explained without a reference to the testimony, which was quite voluminous.

Mr. Justice CLIFFORD delivered the opinion of the court.

This is an appeal from a decree of the Circuit Court of the United States for the eastern district of Virginia, sitting in admiralty. The libel was filed in the District Court, by the appellees, on the thirteenth day of June, 1855. It was a proceeding *in rem* against the steamship Pennsylvania, and was instituted to recover compensation for certain damage done to the steamship Jamestown, by means of a collision which occurred between those steamers in Elizabeth river, on the night of the seventh of January, 1855, some five or six miles below the port of Norfolk, in the State of Virginia. At the time of the collision, the Jamestown was on her regular weekly trip from the port of Norfolk to Richmond, in the same State, and the Pennsylvania was proceeding up the river to Norfolk, in the prosecution of her regular semi-monthly trip from Philadelphia to her place of destination. Libellants allege that the Jamestown was pursuing her usual and proper course down the river, and that the collision occurred in consequence of

the improper and unskillful management of those in charge of the other steamer. Process was duly served, and the respondents appeared and answered to the suit. They admitted the collision, but alleged, in effect, that it occurred in consequence of the intense darkness of the night, occasioned by a dense fog, without any such negligence or fault as is alleged in the libel, and in spite of every possible precaution on the part of those in charge of their steamer to prevent it. A decree was entered for the libellants in the District Court, which was affirmed, on appeal, in the Circuit Court, and thereupon the respondents appealed to this court. It is now conceded by the respondents that the collision was not occasioned by any fault on the part of those in charge of the injured vessel, but it is insisted in their behalf that the colliding steamer was also without fault, and that the collision was the result of inevitable accident. To establish that defence, they rely entirely upon the character of the night, as shown by the evidence, and the circumstances attending the disaster. From the evidence, it appears that the Jamestown left the wharf at Norfolk on the seventh of January, 1855, about eleven or half past eleven o'clock at night, as alleged in the libel. When she started there was a thick fog in the harbor, but she met with no difficulty in passing out, and it so far cleared away in about half an hour that those in charge of her deck, as she proceeded down the river, could see the lights and even the hulls of vessels ahead, and the land on the eastern shore. Several witnesses also testify that the moon had risen, and that stars were occasionally visible, though they admit that it was still quite foggy, and that there was a heavy mist on the water. Two competent look-outs were accordingly stationed at the usual place in the forecastle, and the signal-lights of the steamer were properly displayed. Those precautions had been taken at the time the steamer left the wharf, but about the time she passed the naval hospital, the master, as he had been accustomed to do on similar occasions, left the quarter-deck, and took a position in the rigging of the steamer, some ten feet above the hurricane-deck. Leaving the look-outs properly stationed in the forecastle to perform their usual duties, he

doubtless chose that more elevated situation to get a less obstructed view of distant objects, and he testifies that he could then see a mile and a half ahead, and the evidence furnishes no good reason to doubt the truth of his statement.

Intending to take the eastern side of the channel, another precaution also became necessary, so as not to incur the hazard of running the steamer aground; and to guard against any such danger, he directed the mate to heave the lead at short intervals, and to report to him the soundings; and the order was faithfully obeyed. Having taken these precautions, he continued to prosecute the voyage at a moderate rate of speed, sometimes stopping the engine when the fog shut in, and occasionally ringing the bell and sounding the whistle; and, the steamer, pursuing her regular course, rounded Lambert's point in perfect safety, passing so near to the buoy located there that it was seen by the master from his position in the rigging, and particularly noticed. On arriving there, it was necessary to change the course of the steamer; and inasmuch as he had noticed the buoy, he was enabled to perform that duty without danger of mistake. Orders were accordingly given to the wheelsman to set the course north one-fourth east, and to run by the compass. During all this time the master remained in the rigging, and he testifies that after the steamer rounded the point, he could see from the buoy to Craney Island light-ship, which, according to his estimate, is a mile and a half. Presently, however, as the steamer advanced, he saw another light, on the larboard bow of the steamer, and finding upon inquiry that the wheelsman had not seen it, he called his attention to the fact that there were two lights, expressing the opinion, at the same time, that the one last discovered was the light of the Pennsylvania coming up the river. His own steamer at that time was heading north, half east, and he directed the wheelsman to port the helm, so as to keep both lights well on the larboard bow, which had the effect gradually to sheer the steamer still closer to the eastern side of the channel. She had previously been running in about four fathoms of water, but the mate soon reported that the soundings showed only three, and as she

advanced, he informed the master that there was but two and a half fathoms, and cautioned him that there was danger of running aground. At this time the master saw the signal-lights and hull of the Pennsylvania, as she passed the light-ship, on the western side of the channel. Immediate orders were then given to ring the bell and sound the whistle, and the master testifies that the signals were answered from the approaching steamer. Shortly afterwards, the mate reported that the soundings showed but ten feet of water, and immediately upon receiving that information he gave the necessary orders to stop the machinery, and reverse the engine. Both orders were promptly obeyed, and it was then the master first discovered that the approaching steamer had altered her course, and was heading diagonally across the channel towards the Jamestown. They were then less than a quarter of a mile apart, and seeing that a collision was almost inevitable, he instantly directed the alarm-bell to be rung, and the whistle of the steamer to be sounded; and as there was nothing more that he could do to avoid the danger, he gave warning to the men in the forecastle, and left the rigging, and returned to the quarter-deck. Further reference to the circumstances preceding the collision, so far as respects the injured steamer, is unnecessary at this stage of the investigation. According to the evidence, it seems that the Pennsylvania arrived off Cape Henry at an early hour in the evening of the day of the collision, but in consequence of the fog and the difficulties of the navigation she did not enter the river till after eleven o'clock at night. She proceeded up the river at the rate of about six miles an hour, and the mate, who was the acting pilot after she entered the river, and had charge of her deck, admits that she ran very close to the before-mentioned light-ship, and that her course at that time was south, half east, and it is not possible to doubt that if she had continued on that course a short time longer, all danger would have been avoided. Such, however, was not the fact, as is clearly shown by the pilot himself, and we refer to his testimony in preference to that of the master, because the latter remained in the

saloon until just before the collision occurred. Among other things, the pilot admits, that shortly after his steamer passed the light-ship, he gave the order to starboard the helm; and what seems even more remarkable, in cases of this description, he acknowledges that he gave the order after he knew that another steamer was approaching, though he denies that he had seen her lights. His theory is, and he accordingly testifies, that he first gave the order to stop and back; and inasmuch as that order had been executed, and the steamer had actually commenced to back, that putting the helm a-starboard had the same effect as porting the helm would have produced if the steamer had been going ahead. But it is a sufficient answer to that theory, as applied to this case, to say that the evidence shows beyond the reach of doubt, that the steamer was still advancing at the rate, at least, of three or four miles an hour, so that, upon his own theory, he committed an error, and according to his own testimony he committed it with a knowledge of the approaching danger. Three or four witnesses, including the master of the colliding steamer, testify that she was advancing three or four miles an hour when the collision occurred, and the damage done to the injured steamer proves to a demonstration that her headway must have been very considerable. On the contrary, the injured steamer had nearly stopped, and being already as close to the eastern side of the channel as the means of navigation would allow, she was almost as powerless to prevent the collision as if she had been lashed to the wharf from which she started. It was under these circumstances that the two steamers came together, and the evidence shows that the colliding steamer struck the other on the port-bow near the forward gangway, some thirty or forty feet abaft the stem. As described by the witnesses, it was a full blow at right angles, and had the effect to force the stem of the colliding steamer some six feet into the hull of the other, tearing up the deck of the forecastle a third part of the way across the vessel, and breaking into two pieces six or eight of the largest timbers. Looking at the whole circumstances of the collision, it is vain for the respondents to suppose that

this court can hold that it was the result of inevitable accident. Where the collision occurs exclusively from natural causes, and without any negligence or fault either on the part of the owners of the respective vessels, or of those intrusted with their control and management, the rule of law is, that the loss must rest where it fell, on the principle that no one is responsible for such an accident, if it was produced by causes over which human agency could exercise no control. Stainback et al. *v.* Rae et al., 14 How., 533; 1 Pars. M. L., 187. But that rule can have no application whatever to a case where negligence or fault is shown to have been committed on either side; for if the fault was one committed by the libellant alone, proof of that fact is of itself a sufficient defence; or if the respondent alone committed the fault, then the libellant is entitled to recover; and clearly, if both were in fault, then the damages must be equally apportioned between them. Plainly, therefore, it is only when the disaster happens from natural causes, and without negligence or fault on either side, that the defence set up in this case can be admitted. Inevitable accident, as applied to cases of this description, must be understood to mean "a collision which occurs when both parties have endeavored, by every means in their power, with due care and caution, and a proper display of nautical skill, to prevent the occurrence of the accident. The Locklibo, 3 W. Rob., 318. The John Frazer, 21 How., 184. It is not inevitable accident, as was well remarked by the learned judge in the case of the Juliet Erskine, 6 Notes of Cases, 634, where a master proceeds carelessly on his voyage, and afterwards circumstances arise, when it is too late for him to do what is fit and proper to be done." He must show that he acted seasonably, and that he "did everything which an experienced mariner could do, adopting ordinary caution," and that the collision ensued in spite of such exertions. The Rose, 7 Jur., 381. Unless the rule were so, it would follow that the master might neglect the special precautions which are often necessary in a dark night, and when a collision had occurred in consequence of such neglect, he might successfully defend himself upon

the ground that the disaster had happened from the character of the night, and not from any want of exertion on his part to prevent it. The Batavier, 40 Eng. L. and Eq., p. 25. The Europa, 2 Eng. L. and Eq., 564. The Mellona, 5 Notes of Cases, 558. Applying these principles to the present case, it is obvious that the defence set up by the respondents cannot be sustained. They not only fail to show that the steamer was without fault, but the testimony of those in charge of her incontestably proves that they were guilty of negligence in more than one particular. Both steamers were in the prosecution of their regular and stated trips, and of course those in charge of them knew, or ought to have known, that they were liable to meet each other on the route; and if it was so dark that the lights of an approaching steamer could not be seen, it was negligence in the master, while his steamer was proceeding at the rate of six miles an hour, to remain in the saloon, wholly inattentive to the peculiar dangers incident to the character of the night; and if it was not unusually dark, then it is clear that there was gross negligence on the part of those in charge of the deck. It is shown by the evidence, that the colliding steamer had two look-outs; but it is not shown what, if any, duty they performed in the emergency, or that any inquiries were made of them, either when the course of the steamer was changed near the light-ship, or when the pilot heard the noise made by the wheels of the approaching steamer. But the great fault committed on the occasion was that of putting the helm to starboard, instead of keeping the course or porting it when it became known that the other steamer was approaching; and the excuse given for it by the pilot, that he supposed his own steamer was backing, only adds to the magnitude of the error, as it shows that the order was given without knowing what its effect would be, which could only have happened from indifference or inattention to duty.

For these reasons, we are of the opinion that the decision of the Circuit Court was correct, and the decree is accordingly affirmed, with costs.