THE THOMAS CARROLL.

*(District Court, N. D. New York. June 5, 1885.)*

1. COLLISION—ERIE CANAL—INEVITABLE ACCIDENT—FAULT.
    Where a collision occurs, on a bright starlight night, between two boats going in opposite directions at a speed of less than three miles an hour, upon the sluggish waters of a canal, it cannot be attributed to inevitable accident, and especially so, when they see each other in ample time to execute all necessary maneuvers.

2. SAME—DUTY OF BOAT IN UNUSUAL POSITION.
    Where a boat is in an unusual position, where she has no right to be, she must take adequate and necessary means to inform others of the fact.

3. SAME—NEGLIGENCE.
    In order to hold the injured vessel responsible, she must not only be at fault, but the fault must in some way contribute to produce the accident.

*Benjamin H. Williams,* for libelant.
*George Clinton,* for respondents.

Coxe, J. On the fifth of August, 1883, the steam canal-boat Venus, with her consort Leto, was proceeding westwardly along the Erie canal. Both boats were loaded with cement. The Leto was pushed ahead of the Venus, being fastened to her by stiff iron couplings. At midnight, and when about a half of a mile west of May's point, in the county of Seneca, a collision occurred between the Leto and the steam canal-boat Thomas Carroll. It is to recover for the injuries thus sustained by the Venus and Leto that this action is brought. The Carroll was loaded with grain, and was destined for New York. She was without a consort. At the point in question the canal is about 68 feet wide, the navigable channel being about 38 feet wide. The berme bank is on the north, or right-hand side, the tow path on the south, or left-hand side, going east. The three boats were of about equal dimensions, being 96 feet in length and $17\frac{1}{2}$ feet beam.

Where a collision occurs, on a bright starlight night, between two boats, going in opposite directions, at a speed of less than three miles an hour, upon the sluggish waters of the canal, it cannot be attributed to inevitable accident, and especially so, when they see each other in ample time to execute all necessary maneuvers. Merely to state the facts is to answer the proposition in the negative. As there was no *vis major*, it necessarily follows that either the Venus and her consort, or the Carroll, or both, were at fault.

A careful examination of the evidence has failed to disclose any dereliction of duty on the part of the Venus and Leto which can fairly be said to have contributed, in any appreciable degree, to the accident. For it is quite evident that the injured vessels would not be inculpated, even though it were determined that all the accusations now brought against them, both in equipment and management, were fully supported by the proofs. It is not easy to trace any connection between the collision and the absence of inboard screens for the lights, the use of the stiff coupling, or the failure to have a lookout on the bow of the Leto. Had the screens been present and the coupling absent, had the captain stood at the exact point where, it is now asserted, he should have been, the consequences would have been the same. Nothing that the Venus and Leto reasonably could be expected to do to avert the injury was omitted. The crew exhibited as much skill and prudence as could be expected in the circumstances. Had they executed some of the maneuvers and followed some of the theories advanced upon the trial, not only would the disaster, in all probability, have been more severe, but the libelant would, in part at least, have been held responsible for it. The Venus and Leto were where they had a right to be, and where it was their duty to be. Immediately upon discovering the proximity of the Carroll, and informing her of their presence, they followed the ancient law of the sea, and put their helm a-port. They kept as close to the berme bank as possible, and were there when the blow was given.

Their engine was reversed, and speed slackened as soon as danger was apparent. They were hardly moving at the time of the collision. Every means of safety had been exhausted, and they were practically helpless. The situation in this respect was not unlike that of the injured steamer in *The Pennsylvania*, 24 How. 307, 312. Could their master have foreseen the erratic and unexpected course of the Carroll, he might have taken many additional precautions, but this he could not know. It was to him an ordinary case of two steam-boats meeting on a clear night. He assumed, and he had a right to assume, that if he kept his own side all would be well. He was not called upon to predict that the coming boat would take his water and attempt to pass him on the starboard side. From what has been said already, it follows, as an almost inevitable presumption, that the Carroll was at fault. Her negligence is, however, not left to presumption; it is clearly proved. Even upon her own theory she cannot escape. The evidence, viewing it in the best possible light for the respondents, is that the Carroll saw the Venus and Leto far enough ahead to do all that was necessary to prevent accident. She was then 19½ feet from the berme bank and 300 or 400 feet from the Leto. If, in traversing this space, she had swung 18 feet to the right, she would have passed in safety. She gave one whistle,—"Go to the right,"— which was answered by the same signal from the Venus. The libelant's evidence regarding the signals is stoutly disputed, but it is thought that the preponderance of proof is against the respondents on this point. Moreover, the direct testimony is supported by strong presumptions. It is hardly within the realm of probability that two boats, meeting at night upon a narrow water-way, would give contrary signals, one saying, "Go to the right;" the other replying, "We cannot; we are going to the left, and you must go to the left also;" and that there the interchange of signals should cease. All agree that but one signal was given from each boat; the respondents, however, contend that the Carroll answered the one blast of the Venus by giving two. If this were true, would not so experienced a navigator of the canals as the master of the Venus have taken some notice of it, and if he failed to do so, would not common prudence have dictated to the Carroll the necessity of repeating her own signal in order that the Venus might surely understand it? Is it likely that both boats would run into inevitable danger, each knowing that the other was turning toward the berme bank, and make no further attempt to extricate themselves?

If the Carroll, as her master says, was aground, or dragging on the bottom of the canal, 19 or 20 feet from the berme bank, unable to get off, she should not have contented herself with one signal or two signals. She should have informed the Venus and Leto beyond the reach of doubt that she lay directly in their path; the path, which, in ordinary circumstances, it was their duty to take. But she did nothing of the kind. The libelant insists that the Carroll at first

turned to the right and kept upon the tow-path side until so near the Venus and Leto, that any change of the latter's course was impossible, when she suddenly took a sheer and struck the Leto, lying helpless on the berme bank. If this be the correct version she was guilty of a grave fault. If, on the contrary, as the respondents assert, she was aground on the berme bank, directly in the path of the Venus and Leto, and took no measures, except the one signal, to inform them of her extraordinary situation, she was equally culpable.

Where a boat is in an unusual position, where she ought not to be, where she has no right to be, she must take adequate and necessary means to inform others of the fact. Upon either theory, then, the Carroll was negligent, and the agreement of her master, immediately after the accident, when it was thought the injury was slight, to pay the damages incurred, is very suggestive as to what his opinion, at that time, was.

It follows that there must be a decree for the libelant, with costs, and a reference to compute the damages.