## The Chickasaw.

### O'Neil et al. v. Memphis & W. R. Packet Co.

*(District Court, W. D. Tennessee. March 4, 1889.)*

1. **Collision—Vessels at Wharf—Cutting Barge Adrift to Save Steamer —Injury to Other Vessels.**
   One has not the right to save his own property at the expense of another's, unless the property sacrificed in some sense threatens that which he seeks to save. *Held*, therefore, that a steam-boat was liable in a case where the mate cut adrift a flat lashed to the steam-boat, which seemed to him to be in imminent danger of sinking and carrying with it the steam-boat herself, whereby the libelants' barge, lying below, and laden with coal, was sunk by collision with the drifting flat.

2. **Same—Negligence.**
   Steam-boats, in a crowded harbor, coaling from a flat along-side, assume the duty of protecting the flat from drifting logs, so far as relates to any danger to craft moored in the current below, should the flat be set adrift to save the steam-boat from the peril of its sinking along-side while lashed together, unless they bargain with the owner of the flat to give attention to its management in navigation during the process of taking coal from it; and it is negligence in the steam-boat not to protect the flat meanwhile by fenders against the drift, or, if the safety of the steam-boat demand that the flat should be detached, not to hold it with lines to prevent collision, if set adrift, with the craft lying in the river below.

3. **Same—Inevitable Accident.**
   It is not inevitable accident which causes the collision between a drifting flat and libelant's barge, moored to the wharf, if the flat has been voluntarily turned adrift by a steam-boat, having it attached along-side for coaling, although the mate of the boat cut it adrift while in a sinking condition from contact with a drift in the river, and in order to keep the steam-

boat from being also sunk by the sinking of the flat; nor is it a common peril of navigation which both must share; and, particularly, if the peril of the flat and steam-boat has been caused by neglect to protect them against drifting logs.

**4. SAME—ERROR IN EXTREMIS.**

Excusable error of judgment *in extremis* can only be available as a defense where there is some fault or mismanagement of the injured vessel which induced the maneuver that caused the collision. *Held, therefore*, that it was not an excusable error of judgment *in extremis* to cut a flat adrift under a misapprehension of danger to come from its sinking, where, when adrift, it came in collision with a coal-barge moored to the wharf, which was not in any way responsible for the act of cutting adrift.

**5. SAME—BURDEN OF PROOF.**

If a steam-boat in charge of a coaling flat lashed along side voluntarily set the flat adrift, it is *prima facie* negligence, and the burden of proof is upon the steam-boat to show that the act was a proper one, and without fault on her part.

In Admiralty.

Libel by O'Neil & Co. against the steamer Chickasaw,—Memphis & White River Packet Company, claimant,—for injuries caused by collision between libelants' barge and a barge cut loose from claimant's steamer.

*Turley & Wright*, for libelants.

*M. B. Trezevant*, for claimant.

*H. C. Warinner*, for Brown & Jones.

HAMMOND, J. Stating the facts most strongly for the respondents,— and by this is meant the occurrences themselves, and not the conclusions drawn from them by either side,—and it appears that the steam-boat Chickasaw, lying at the Memphis wharf, was coaling from a flat lashed to herself, outside. Heavy drift was running in the river, and had been for some time. A floating tree, being carried by force of the current against the flat, knocked a hole in its forward compartment, which filled with water, and the mate of the Chickasaw, becoming alarmed for the safety of the vessel by the sinking of the flat, which seemed to him to be imminent, cut it adrift, and it was carried by the current against one of the coal-barges of libelants, lying tied to the wharf, not far below and astern of the Chickasaw, which was sunk, and, with its cargo of coal, was totally lost. The sinking of the flat along-side of the Chickasaw would have endangered her and all she carried, by dragging the vessel down with it, and the weight of coal with which it was laden. The Chickasaw's flat did not sink, even after the catastrophe to the libelant's coal-barge, but, floating down the river, was recovered by a tug, and saved, though the captain testifies that it was in a sinking condition, and would have sunk but for his relief to it. It was built in compartments, only one of which was injured or filled with water, though the mate did not know of that construction perhaps,—he being now dead, and not here to testify as to that or any other fact connected with the disaster. He was a first-class mate, of experience and of good character in all respects. The flat coaling the Chickasaw belonged to Brown

& Jones, coal dealers, and was, according to the usages and custom of this port, placed by their tug along-side the steam-boat, and left solely to her care, without any one aboard to look after it, except that two coal-checkers were on it to keep account of the coal taken, but had no other duty or relation to the flat whatever. Brown & Jones were also sued in this libel; but, it appearing that they were in no fault, but following strictly the custom of coaling steamers at this wharf, the demand against them has been abandoned. Witnesses testify and the court finds from their opinion, and from the fact that the flat kept afloat so long, that by the use of a line the flat could have been dropped below and astern of the Chickasaw, and held there, so as to avert any danger to the steam-boat by its sinking and, of course, any disaster to libelants' barge by collision. The proof does not show clearly whether there were any lines aboard the Chickasaw or the flat, available. One was cut which lashed the two together, and perhaps all were in use to hold the steamer to her fastenings; but some of the witnesses thought that those at hand might have been used by splicing, or without it, while others thought there was no line, and apparently no time to provide one, long enough to drop the flat far enough astern to free the wheel of the Chickasaw of the sinking flat. No precautions whatever were taken to prevent the drift-wood from coming in contact with the coal-flat by any one, and it is not customary, unless there is special cause for it, to protect them by fenders, while temporarily lashed to a steam-boat, against the drift. The answer charges negligence against libelants, but it is hardly insisted on, and the proof shows not the least. They were in their accustomed berth at the wharf, assigned to them by municipal authority, known of all men about the river and to respondents, and engaged in their usual occupation of delivering coal from their barges to their customers; this lost barge being engaged in discharging cargo at the time. She had fenders out against the drift-wood, and those unloading her—one of them at some peril—did all they could to avert the collision.

Now, the court cannot assent to the contention that under any circumstances, be the peril what it may, flats or barges heavily laden with coal can be set adrift in the river here to float by the city wharf, and endanger the craft that lie along it, upon the notion that the cutting loose is done to save other property at the expense of that which may be lost by collision with the drifting barge, and that this may be done without any liability for such collisions. But certainly such assent cannot be given, under the circumstances above stated, hard as the case seems to be for the respondents. In hard cases, if possible, more than in others, the loss must always fall where the law places it, and this case is no harder for the respondents than for the libelants, that they should stand this loss. What right has one to save his property at the expense of another's? All must take the risks of common peril, each his share according to his risk, but none, it seems to me, is liable, unless he contracts— as an insurer does—to take the risks of his neighbor; and that is what the respondents have asked the libelants to do in this case, without hav-

ing paid the consideration that underwriters usually charge for such undertakings.

The celebrated *Squib Case*, 2 W. Bl. 892, so much urged by learned counsel, is not in point. There one threw a lighted squib into the marketplace, which, falling upon the stand of A., was by him thrown off upon the stand of B., who in turn threw it off, and it struck the plaintiff in the eye. He recovered against the original thrower of the squib, but we are not advised that it has ever been decided that he might not have recovered also against the others. One of the judges said that "they or any by-stander had, I allow, a right to protect themselves by removing the squib, but should have taken care to do it in such a manner as not to endamage others." Another did say that "any innocent person removing the danger from himself to another is justifiable; the blame lights upon the first thrower." *Scott* v. *Shepherd*, 2 W. Bl. 892, 1 Smith, Lead. Cas. 549. It was only a question of pleading involved, and neither of the above utterances was decided; but, taking the last to be the law, and the respondents here must fail, because they are not "any innocent person," on the facts of this case, but are in the attitude of "the first thrower," —if there be any analogy between the cases at all. Treating the sinking flat as analogous to the squib, who placed it against the Chickasaw? The Chickasaw herself. It was by her contract and agreement placed there, and it was a part and parcel of herself, as if she had borne it on her deck. There can be no doubt of this on the authorities, which I need only cite in this place: *The British Empire*, 24 Fed. Rep. 493; *The Merrimack*, 2 Sawy. 586–595; *Sturgis* v. *Boyer*, 24 How. 110; *The Maria Martin*, 12 Wall. 31, 44; *The Clara Clarita*, 5 Ben. 375–381, 23 Wall. 1–15; *The W. H. Clark*, 5 Biss. 295, 306; *The Quickstep*, 9 Wall. 665; *The Doris Eckhoff*, 32 Fed. Rep. 555; *The A. R. Wetmore*, 5 Ben. 147; *The City of Alexandria*, 31 Fed. Rep. 427. Most of these cases are of tugs and tows; but the principle is the same, and it is that the commanding vessel is responsible, and, if there be a division of command and control between the two, then each and both are liable jointly and severally to the injured third party. The Chickasaw could have limited her liability by a contract that Brown & Jones should retain command and control of their flat, and be responsible for her navigation and management, including her protection against drift, while delivering coal; but she did not do that, but assumed entire control, and, under the circumstances, entire responsibility for her management. The fact that two coal-checkers were on the flat is immaterial, as is obvious. It is the same as if the Chickasaw had cut herself adrift to save herself; and there we have direct authority that she would have been liable. A vessel in Galveston harbor, lashed to a wharf, cut herself loose to save herself from sinking in a storm, and collided with another vessel at anchor there, and she was held liable for the damages. *Sherman* v. *Mott*, 5 Ben. 372, affirmed on appeal. Id. 372, and note. Again, in the case of *The Clara Clarita*, *supra*, affirmed twice on appeal upon the grounds of the original opinion, Mr. Justice BLATCHFORD, then the district judge, lays down the rule of law that must control this case, beyond doubt, it seems to me.

A ferry-boat was on fire at her dock. A tug came, voluntarily, to her relief, and towed her out with a hempen hawser, which burned, and which, being again attached, burned again, and the burning boat drifted against a schooner at anchor, and set her.on fire. Held, that the tug was liable, although it was all done to save other property at the wharf from the peril of the burning boat, and the same defense was set up there as here. What the learned judge said has direct application here. He calls attention to the suggestion of blowing up a house by the common-wealth's authorities to save other property from fire, and to throwing overboard the goods of another to save the ship and her lives, and points out with his usual ability the utter fallacy of the suggestion. He says:

"The necessity must be a direct one, an obvious one, a necessarily resulting one. In the case of the building or goods in the vessel, the necessity for the sacrifice, as well as the act of sacrifice, must both of them be direct in reference to the thing sacrificed. There must be no fault in either substituting a fancied necessity for a real necessity, or in. negligently doing what is done, so that the existence of the necessity comes to rest only on the fact of sacrifice, when the sacrifice would not have occurred but for the negligence."

He then shows that it was not necessary to sacrifice the libelant's schooner by setting her on fire to save the other property. So, here, it was not necessary to sacrifice the libelants' barge of coal to save the Chickasaw, because she was not at all endangered by that barge, as the intervening house endangers the more remote for whose safety it is sacrificed, nor as the goods thrown overboard endanger the vessel from which they are thrown, however necessary it might have been to sacrifice Brown & Jones' coal-flat which was sinking at her side. He also found the tug negligent in using a hempen hawser, although she had on board no metal cable or chains, and it was not usual to carry them, saying that, obviously, the extraordinary service required, if undertaken, adequate appliances. If the flat had been torn loose by the drift in the current, without the fault or negligence of the Chickasaw's people in that behalf, or without their voluntary action in cutting it adrift, then the case would have been one of disaster by the perils of navigation or inevitable accident, and different from this. In such cases there is now no doubt that with us there would be no division of loss, but that it must fall wholly upon him who suffers, if neither be to blame. *Stainback* v. *Rae*, 14 How. 532; *The John Fraser*, 21 How. 184, 194; *The Morning Light*, 2 Wall. 550; *The Grace Girdler*, 7 Wall. 196.

Clearly, this was not a case of inevitable accident in this sense of the law, unless every disaster by peril of navigation is to be held such, which cannot be so, in the nature of the law against negligence in navigation. The supreme court says: "A collision, which occurs when both parties have endeavored by every means in their power, with due care and caution, and a proper display of nautical skill, to prevent the occurrence of the accident" —is an inevitable accident. "It is not inevitable accident * * * where a master proceeds carelessly on his voyage, and afterwards circumstances arise when it is too late for him to do what is fit and proper to be done. He must show that he acted seasonably, and that he did everything

which an experienced man could do, adopting ordinary caution, and that the collision ensued in spite of such exertions." *The Pennsylvania*, 24 How. 307, 313. "It is not inevitable accident where, notwithstanding a sudden and severe gale, the danger could have been averted by proper measures, seasonably taken, if good judgment and good seamanship had combined, and if the requisite skill had been displayed before the peril was so near that all precautions were too late." *The David Dows*, 16 Fed. Rep. 154. The *vis major* of a hurricane is no defense, if the collision could have been avoided by foresight, precaution, and nautical skill. *The Thule*, 3 Woods, 670. Undoubtedly, the best skill nor the highest degree of caution is not required, but only that which is reasonable under the circumstances, and that which experience has justified as sufficient. *The Austria*, 14 Fed. Rep. 298. But occasional storms and gales should be anticipated and guarded against, and their force is not always a *vis major*, by any means. *The Johannes*, 10 Blatchf. 478. The pony chaise case, cited by counsel, was not that of the voluntary turning loose of the frightened horse by the woman, but a case of want of strength on her part to hold him. Still, her husband was held liable on proof that the horse was in fact left unattended in the street. *Goodman* v. *Taylor*, 5 Car. & P. 410.

The burden of proof is on the vessel adrift to excuse herself, and *prima facie* she is negligent; unless her owners can show due diligence, when she collides with one harmlessly and faultlessly at anchor. *The Louisiana*, 3 Wall. 164; *The Jeremiah Godfrey*, 17 Fed. Rep. 738; *The Brady*, 24 Fed. Rep. 300; *The A. R. Wetmore*, 5 Ben. 147; *The Fremont*, 3 Sawy. 571. Has the Chickasaw answered this burden by the proof in this case, and relieved herself of the imputation of negligence raised by reason of the very fact that her flat was adrift in the river among the craft below her? I think not. I doubt if her mate ever thought of the danger to others; and probably he had the same views of his right to save himself at the expense of anybody else in his way that the learned counsel of her owners have urged upon us with so much zeal in the argument at the bar. The fact that the flat kept afloat so many hours shows he was mistaken as to the extent of the danger, and that he was, to use the language of one of the cases already cited, "substituting a fancied for a real necessity." It is true that we must scrutinize his conduct by the light of the circumstances as they then were; yet the substantive facts afterwards developed may be looked to for the purpose of determining the true conditions and testing his judgment and skill in the premises. The fact that two canal-boats survived all night the perils which were alleged, was held to have contradicted the asseveration of danger as set up by the defense in the case of *The Quickstep*, 9 Wall. 665; and so in the case of *The Louisiana*, 3 Wall. 164, 174, the fact of drifting was held in itself to show a want of proper fastenings. And it is of no avail to set up that this was a mistake of judgment by a skillful navigator in the extremity of his peril, and therefore excusable. The supreme court says:

"To be an excusable mistake *in extremis*, a pardonable maneuver, though contributing to or inducing a collision, when the maneuver would have been

faulty if not excusable, it must be one produced by fault or mismanagement in the other vessel." *The Elizabeth Jones*, 112 U. S. 514, 526, 5 Sup. Ct. Rep. 468.

See, also, *The City of Springfield*, 29 Fed. Rep. 923, 926; *The Osceola*, 33 Fed. Rep. 719; *The Eliza S. Potter*, 35 Fed. Rep. 220; *The Ella B.*, 19 Fed. Rep. 792; *The George L. Garlick*, 20 Fed. Rep. 647. There was absolutely no act on the part of libelants contributing to this maneuver of respondents. But if it be ever possible to invoke this doctrine of excusable error *in extremis* without the contributing mismanagement of the other side,—which is doubtful, I should say, on these authorities,—it cannot, surely, be done where the extremity is brought on by the previous faulty management or negligence of him who asks to be excused because of it. Where it may seem plausible to set up the excuse notwithstanding the absence of fault on the other side, it may be found that the circumstances bring the case rather within the defense of inevitable accident than that of excusable error *in extremis*. Here there was no foresight in providing against the drift-wood, and it was allowed to come at will and beat against the flat. It is an ordinary occurrence in this river that drift-wood, in high water, fills the current, and endangers the craft like that. Libelants had put out fenders to ward it off their barge, and the fact that it is not customary to protect flats while coaling steamboats does not answer this complaint against respondents. It would be ordinary prudence, tested by the reasonable requirements of caution, to provide against these dangers, and no admiralty court can tolerate a neglect of it that imperils other people's property, whatever risks the owners of the steam-boats and of the flats themselves so unprotected may choose to take. The Chickasaw was herself responsible while she had charge of the flat, unless she had other arrangements with Brown & Jones, to protect it from drifting wood or ice, it may be; but no such arrangement is shown by the proof, and, on the contrary, everybody seems, according to the usage, to think that he will take the risk of the destruction of the flat while coaling a steam-boat, and no protection is taken in such cases. The circumstances of this case, especially the dangers that threatened the Chickasaw, show that it is the grossest negligence not to protect the flat against drift-wood, and no amount of usage or custom can relieve one of responsibility, if by that negligence another is imperiled. They are protected while in the fleet, or at their places at the landings, as libelants' barge was on this occasion; and it is because they are only temporarily lashed to the steam-boat, and are expected to be soon removed, that the risk of leaving them unprotected against the drift is taken; but it is none the less negligence because of this inducement, nor because the libelants themselves follow the same dangerous practice while coaling steam-boats, as the proof shows they do. Again, it was negligence not to hold the flat with a line, to keep it from drifting against helpless craft lying in the current below; and the excuse that no lines were at hand only shows that no adequate provision against such dangers as may be expected to occur was made, and this was not reasonable, as the above-cited cases demonstrate, particularly that of only a hempen

hawser to haul off a boat on fire. Every navigator may expect storms or other ordinary perils to navigation to occur; and the danger of drifting wood or ice in our rivers, being well known, must be at all times guarded against by proper precautions if the river men expect to secure themselves from liability for injury to other property through neglect to take such precautions. Their own they may risk as they will, but must guard against risking another's property by such neglect. If steam-boats coal themselves from flats in a crowded harbor they must use all reasonable precaution against the breaking loose of the flats, and I do not think they can under any circumstances voluntarily cut them loose to save themselves without undertaking to answer all damage that shall come by the act to others, who are in no way connected with them, or interested in the danger they seek to avert. Unless they are willing to do this they must take their own risk in the premises. Nor was the act of the mate only the remote cause of the disaster. It was in fact the *causa causans*, and not merely the *causa sine qua non* of the disaster, because no intermediate forces, disconnected with his act in any legal sense, contributed to the calamity that came upon libelants. 2 Thomp. Neg. pp. 1063, 1085, § 3; *Romney Marsh* v. *Trinity House*, L. R. 5 Exch. 204, L. R. 7 Exch. 247; *The George and Richard*, L. R. 3 Adm. & Ecc. 466. Let me close with a most pertinent quotation from the case of *Romney Marsh* v. *Trinity House, supra:*

"The case, therefore, appears to me to be the same as if the ship had been lying at anchor, with the tide flowing rapidly towards a rock, and the defendants had, by some negligence, broken the chain, and set free the ship, in consequence of which it had at once and immediately been carried by the tide with great force and violence against the rock, and had become a wreck. Would not the wreck of the ship have been caused by the negligence which broke the chain? I think that it would, and that such a case and the case before the court are the same; that the negligence of the crew, the servants of the defendants, was thus the immediate cause of the ship being driven against the wall of the plaintiffs, and that the plaintiffs are therefore entitled to recover."

Mr. Bryan testifies that there were 14,984 bushels of coal, and that the barge was worth $270, but objection is made that he only swears by gauger's weights sent to him from Louisville. Of course there should have been direct proof from the gauger, and in its absence secondary proof as to the capacity of the barges of that kind will not be admissible, because the quantity of coal may have been less than that capacity. He testifies that the coal was worth $12\frac{1}{2}$ cents per bushel, and this is satisfactory, as is the proof of the value of the barge. If the parties cannot agree as to the quantity of coal, the clerk will take further proof, and report the proper quantity, and the libelants may have a decree for that amount at $12\frac{1}{2}$ cents per bushel, and the value of the barge at $270; respondents to pay costs. So ordered.