## THE DELTA.

(District Court, W. D. New York. September 1, 1903.)

1. TOWAGE—LOSS OF TOW—NEGLIGENCE OF TUG.

Libelant's scow, which was equipped with a suction pump, was lashed to the side of a stranded tug, being engaged to pump out the water and keep it down while the tug was towed into port. The tug Delta was employed to pull the stranded tug from the reef, after which the towing was to be done by another tug. Immediately after the tow was drawn from the reef, the scow's suction pipe burst, and those on board the tow shouted to the Delta, stating the fact, and asked her to go ahead, and take them to a place of safety, and to hurry up. She then started ahead at an increased speed, the result being the swamping and sinking of the scow, which was low, and being towed stern foremost. *Held*, that libelant, who was on board the tow, must be deemed to have assented to the towing being done by the Delta, but that she was legally bound, in doing it, to exercise ordinary care to proceed only at such rate of speed as was reasonably safe for the scow, and was in fault for exceeding such speed, it not appearing that the situation was such as to require it in order to save the injured tug, and the danger to the scow therefrom being obvious. *Held*, further, that the scow was also in fault for participating in the hails, from which the Delta assumed that the tug in tow was in great danger.

2. SAME—ACTION FOR DAMAGES—DEFENSES.

A tug libeled for loss of a tow cannot avoid liability for any part of the damages on the ground that a third vessel contributed to the injury, unless she files a petition and brings such vessel in, as provided by admiralty rule 59.

In Admiralty. Suit in rem against tug to recover for loss of tow.

Frederick G. Mitchell (George Clinton, of counsel), for libelant.
Crangle & Burke, for respondent.

HAZEL, District Judge. This is a proceeding in rem against the steam harbor tug Delta for damages sustained on account of the sinking of libelant's scow Mayflower on October 11, 1902, near Horseshoe Reef, at the mouth of the Niagara river. At the time of the disaster the scow was lashed abreast and stern foremost to the starboard side of the tug Bellinger, while the steam yacht Corsair was made fast to her port side. On the day before the accident the Bellinger was stranded upon Horseshoe Reef. Thereupon the scow Mayflower was employed to pump her out, assisted by the steam yacht Corsair. The respondent was employed on the day of the accident to pull the disabled Bellinger off the rocks, whereupon the Oneida, a slower and less powerful tug, was to tow the wreck ashore. After the Bellinger was freed of water by the use of the Mayflower's suction pump, a 5-inch towline about 300 feet in length, from the Delta, was made fast to the Bellinger's towing post astern, preparatory to releasing her. Before and at the time of the sinking of the scow the master of the Bellinger and engineer were on board the wreck to render such assistance as might be necessary. Upon receiving a prearranged signal from the master of the Bellinger, the Delta easily released the wreck, which slid into deep water; the scow remaining lashed to her starboard side. Almost immediately after the wreck was released, and while still in use, the suction pump of the scow burst. Thereupon the steam yacht Corsair, which had on board a syphon pump, made fast to the Bellinger's port side, intending to render assistance in keeping her free of water. Fearing a recurrence of a like calamity, or that the injured tug would sink in deep water, those on board the Bellinger and assisting craft became alarmed, hailed the Delta, apprising her of the occurrence and the imminence of danger, and admonished her to hasten with them in tow to a place of safety. The evidence is conflicting as to whether the master of the Bellinger hailed the Delta to quicken her speed. He testifies to an impression (which, however, is denied) that libelant joined in the outcry. Keenan, an employé upon the scow and witness for libelant, testifies on his direct examination that all hands except himself were hailing the Delta to go ahead. It does not specifically appear by the evidence who shouted to the Delta to hurry, but I am quite convinced from the evidence on this point that the hail to the towing tug to quicken her speed because of the supposed danger to the tow had the approval of the master of the Bellinger and the acquiescence of the libelant. Reilly, witness for respondent, corroborates the master of the Delta, and says, "Everybody hollered that the suction pump had burst, and to hurry up and get her inside; that she was sinking." Repeated hails of that nature were heard on board the Delta by her master and engineer. It is true that libelant, who was in personal charge of the scow, with two employés was engaged in arranging the pumping apparatus of the Corsair, then alongside the Bellinger, with a view to its immediate use. The com-

motion caused by breaking the suction pipe, and the alarming admonitions to the Delta, establish beyond serious doubt that the libelant was aware of the shouting, knew that the Mayflower was being towed by the Delta instead of the Oneida, as was originally contemplated, and assented to such arrangement. It appears by the evidence that instantly upon the release of the tug the towline, which had been properly made fast to the Bellinger's stern post in order to expedite her release, was transferred by her master to her bow, according to custom and usages in towing and the changed position of the tug. Thus secured, the Bellinger, Mayflower, and Oneida were towed a short distance, approximately 1,500 feet, when suddenly the scow lurched forward and was sunk, dragging the Bellinger down with her before the speed of the tug could be effectively lessened and the mishap averted. Two signals in quick succession to check the speed of the Delta were given by the Corsair upon the request of the libelant, who became apprehensive because of water coming over the front of the scow. These signals were instantly obeyed by the Delta, although the accident was then inevitable. The disputed point as to whether the Oneida was to tow the wreck and scow is unimportant in view of the above implied towage engagement entered into immediately after the wreck was released.

It is contended by libelant that the sinking of the scow was wholly due to the negligent navigation of the towing tug. It is asserted that the towing speed was unsafe, and practically resulted in drawing the forward end of the scow (which had a freeboard only of two feet and six inches) underneath the water, and her consequent foundering. It is contended on the part of the respondent that the bursting of the suction pipe of the pumping apparatus was the primary cause of the accident; that the scow was negligent in not being properly fastened to the Bellinger; hence the bursting of the pipe when the wreck was pulled into deep water endangered the safety of the tug, and justified the Delta, when admonished of the mishap, in quickening her speed. These grounds of negligence by the scow Mayflower, which was well secured and properly lashed to the starboard side of the wreck, are without foundation or merit. No substantial reason exists for attributing fault to her on account of her failure to part from the wreck. On the contrary, the nature of her employment necessitated her continued presence alongside the imperiled tug. The respondent further charges that the loss was occasioned wholly by the unseaworthy condition of the scow in having a hole or opening in her stern, causing her to rapidly fill with water when towed stern foremost. If this be true—that is, if the scow leaked in the manner claimed while being towed with reasonable care—the responsibility for the damage caused would be determinable without difficulty. The evidence, however, on this point does not impress me as being entitled to much weight. Furthermore, I think the scow was reasonably seaworthy, and that the alleged hole did not contribute to the disaster. She was sufficiently staunch for the particular use to which she was employed, and her condition was not such as to render her employment in calm weather perilous. A different question might be presented for decision had the weather conditions been unfavorable. Giving consideration,

therefore, to the evidence as a whole, I am satisfied that the sinking of the scow was solely because of the excessive speed of the towing tug. From this standpoint the responsibility of the respondent will be considered. It was the duty of the Delta, as a towing steam tug, to exercise ordinary care, diligence, and skill in her navigation, and to use such rate of speed only as might be safely employed to tow a scow of the construction and dimensions of the Mayflower. The Mosher, 4 Biss. 274, Fed. Cas. No. 9,874; The Niagara (D. C.) 20 Fed. 152. Counsel for libelant maintained that, irrespective of the apparent exigencies of the situation in the absence of specific waiver by the Mayflower of a positive legal duty to use ordinary care and diligence, the Delta must be held in fault for going at a rate of speed which manifestly was hazardous to the safety of the scow. In other words, that fault is imputable to the towing tug because of her excessive speed, irrespective of any imminent danger to the Bellinger and those on board of her. To support this argument the court is cited to The Chickasaw (D. C.) 38 Fed. 358; Sherman v. Mott, Fed. Cas. No. 12,767; The Clara, Fed. Cas. No. 2,788. This question, however, need not, in view of the facts found, be discussed or decided. It is not controverted that the owner of the Mayflower had nothing to do with the navigation of the tow. Neither was the libelant specially concerned with the movements of the scow while lashed alongside the wreck. The duty of the libelant, besides supplying the necessary pumping apparatus, was to perform manual labor only in pumping out the wreck. The Mayflower must be presumed to have assented to all reasonable directions concerning the movements of the tow given by the master of the Bellinger to the Delta, as such directions had relation only to the purpose for which she was employed. It quite clearly appears by the evidence that the shoutings of alarm and admonition to hasten ashore by those on board the tow, to which reference has already been made, induced the Delta to increase her speed, which obviously endangered the safety of the scow. Although the occasion required the exercise of prudence and foresight, the gravity of the situation nevertheless was not such as entirely justified the course adopted. The conditions simply demanded the exercise of reasonable caution in a moment of possible difficulty and danger such as navigators not infrequently confront. Despite the cries of alarm the occasion was not specially dangerous or hazardous, for almost instantly after hailing the Delta signals were given to check her speed. As I am of the opinion that the sinking of the scow could have been avoided by the Delta through the use of slower speed, the suggestion on argument that the disaster was inevitable lacks force. A defense of inevitable accident may only be interposed where it appears that the accident happened because of some act beyond the control of the person or ship charged with the commission of the negligent act, which could have been avoided by the exercise of such care as the law required. 16 Am. & Eng. Ency. of Law (2d Ed.) 242. Neither the highest skill nor the greatest care is required of a towing tug, but, as already remarked, reasonable skill, care, and foresight must be exercised by those intrusted in handling a tow. The Niagara, supra. The respondent tug was legally bound to proceed through the water at

such rate of speed only as was reasonably safe to the Mayflower. Her excessive speed is not justified by asserting a situation requiring increased speed to save the Bellinger from loss, thereby sacrificing the scow. The Delta, although induced in the first instance to increase her speed, was not justified in a long-continued increase of such speed when the ordinary observation from a towing vessel would have demonstrated that such excessive speed would result in the destruction of the Mayflower. Because of the absence of that degree of care, therefore, which the towing tug was bound to exercise, she must be held in fault. The Mayflower was also to blame. She is in fault for participating in the hails by which the Delta assumed that there was great danger to the safety of the Bellinger.

Another point is made by respondent. By the testimony of Keenan, libelant's witness, it appears that for the period of about one or two minutes the Oneida, which closely followed the scow astern while being towed by the Delta, shoved her forward through the water. Obviously, such an act by the Oneida would have contributed to the disaster, but it does not appear that the libelant had knowledge thereof, or assented to it in any way, otherwise it might with propriety be considered a fault for which the scow would be responsible. Even assuming the Oneida to have contributed to the accident, no cross-libel, as provided by admiralty rule 59, having been filed by respondent, this court cannot decree against her. The Atlas, 93 U. S. 317, 23 L. Ed. 863; The New York, 175 U. S. 209, 20 Sup. Ct. 67, 44 L. Ed. 126.

For the reasons stated the tug Delta and the scow Mayflower are held to be in equal fault, and therefore the damage sustained must be equally apportioned between them. A decree containing an order of reference to compute the damages may be entered accordingly.