## THE LINUS S. ELDRIDGE.

### ELDRIDGE v. THE MARY E. D'EON, Inc.
#### No. 1466.

District Court, D. Massachusetts.
May 18, 1948.

Seymour P. Edgerton and Bingham, Dana & Gould, all of Boston, Mass., for libelant.

Thomas H. Walsh, of Boston, Mass., for respondent.

FORD, District Judge.

This is a libel for damages resulting from a collision on the high seas between the fishing vessels Linus S. Eldridge and The Mary E. D'Eon on June 30, 1946 in a thick fog on George's Bank.

At about 5:30 A.M., on the above date, The Linus S. Eldridge had just completed dragging for scallops and had hauled her drags aboard to empty them on the deck. She was laying to with her engine in neutral. Five of the ten members of the crew were on deck, some engaged in repairing the fishing gear, and others opening scallops. The master was in the pilot house, on the starboard side, apparently serving as lookout while waiting for the crew to finish the repair of the gear.

The first indication of trouble was when the engineer, who was opening scallops admidship and forward of the pilot house, saw the riding sail, then the hull, of another boat loom up on the port side and forward at about 50 yards, the limit of his visibility. She was heading for The Linus S. Eldridge. The engineer yelled, "Look out." The master saw The Mary E. D'Eon at about 18 yards on his port bow at about a 45 degree angle. Shortly thereafter the port side of the Mary E. D'Eon struck the port side of The Linus S. Eldridge a glancing blow. In the intervening space of time, the master of The Linus S. Eldridge did nothing to avoid the collision; under the circumstances he could have done nothing since the time between when he first saw the approaching boat and the time of the impact was only three or four seconds. The Linus S. Eldridge had not sounded her whistle within more than two minutes before the impact. The captain of The Eldridge was rather uncertain with respect to blowing his whistle. He stated to an examining officer of the Coast Guard that he blew it "two or three minutes" before the collision. At the trial he could not definitely state that he blew it within two minutes of the collision. The engineer of The Eldridge testified it could have been five minutes before the collision that the

whistle was blown. He also testified it had not been blown for at least three minutes before the collision. A member of The Eldridge's crew testified he did not know when the latter blew her whistle before the collision. The captain of The D'Eon testified he heard no whistle from The Eldridge and a member of the crew of The Mary E. D'Eon testified he heard no whistle for at least five minutes before the collision. The conclusion of fact made that the whistle was not blown for more than two minutes before the collision is supported by abundant evidence. In fact it is a more probable conclusion from the evidence that it had not been blown for five minutes at least before the impact.

The Mary E. D'Eon had been dragging for scallops to the north of The Linus S. Eldridge on the morning of June 30, 1946, had finished her drag and was steaming to at new area. Six of the crew were on deck and engaged in various activities, but none was posted as a lookout. The master was in the pilot house navigating the boat, proceeding at six or seven miles per hour. The master saw The Linus S. Eldridge loom up out of the fog at about 50 yards dead ahead. He reduced his speed about one mile per hour, sounded his whistle, and got the wheel partly to starboard, when he struck. Under the circumstances, considering the speed at which he was traveling, the visibility, and the maneuverability of his craft within the 50 yards, he could not have avoided the collision. He did avoid going "right through" The Eldridge by putting his wheel over to starboard. I find he did all a reasonably prudent master could have done to avoid a collision after he saw The Eldridge. Prior to the impact he had sounded his whistle at regular intervals of less than two minute duration. He knew generally that there were other fishing vessels in the area.

The Linus S. Eldridge is an oil screw fishing vessel, 77 feet in length, 18½ feet in breadth, of 74 gross tons, 50 net tons. The Mary E. D'Eon is an oil screw fishing vessel about 68 feet in length, 18 feet in breadth, with a maximum speed of better than 8 miles per hour.

At the time of the collision it was daylight, and both parties agree that there was a dense fog, no wind, and a smooth sea. The master of The Linus S. Eldridge thought that visibility was only 30 yards; but others testified that it was 50 yards, which I accept and find as the extent of visibility.

Article 15 of the International Rules (applicable here) for Navigation at Sea provides, 33 U.S.C.A. § 91:

"In fog, * * * whether by day or night, the signals described in this article shall be used as follows, namely:

"(a) A steam vessel having way upon her shall sound, at intervals of not more than two minutes, a prolonged blast.

"(b) A steam vessel under way, but stopped, and having no way upon her, shall sound, at intervals of not more than two minutes, two prolonged blasts, with an interval of about one second between."

Article 16 of the International Rules, 33 U.S.C.A. § 92, provides: "Every vessel shall, in a fog, * * * go at a moderate speed, having careful regard to the existing circumstances and conditions."

■ I find that The Linus S. Eldridge was violating Article 15(b) at the time of the collision, and that this failure to sound the signals was a fault which was a contributing cause to the occurrence of the collision. The rule, by requiring two long blasts at intervals of two minutes from a stopped vessel in a fog, recognizes the danger it presents to other shipping.

■ I find that The Mary E. D'Eon was violating Article 16 in that six or seven miles per hour was an excessive speed under the circumstances; that this fault was also a cause of the collision since she could have avoided the collision if she were proceeding at a moderate rate of speed despite the failure of The Linus S. Eldridge to give signals. The Mary E. D'Eon is not relieved of her negligence because The Eldridge was at fault.

■ I find that failure of the master of The Mary E. D'Eon to post a lookout at the bow of the vessel did not contribute to the collision. On a vessel of such small size, the additional time and space that would have been provided by a warning from a lookout in the bow was negligible.

There is only one difficulty in this case which requires attention. Proctors for the libellant urge that any signals by The Linus S. Eldridge would add nothing really new to the situation because (1) the master of The Mary E. D'Eon was himself partially deaf and had posted no other lookout to listen for warning whistles and "(2) the master of The Mary E. D'Eon already knew that there were other fishing vessels in the vicinity when he proceeded at six or seven miles per hour into the fog. In other words, it is said that. the failure of The Linus S. Eldridge to comply with Article 15(b) did not contribute to the collision.

Article 15(b) categorically requires the signal to be sounded. The whistle of The D'Eon, it is stipulated, could have been heard two or three miles when sounded. Under the facts as I have them, it is probable that the master [1] of The Mary E. D'Eon, or a member of her crew, would have heard a signal, if given. If so, it is reasonable to infer the master of The D'Eon would have slowed down to a safe rate of speed and avoided a collision with a vessel stopped in a fog. Also the evidence showed that if The D'Eon had just a few seconds more time it could have avoided the collision altogether. Certainly in view of the distance The Eldridge's signal would carry, if it were blown and heard, there would have been ample time to stop or change course and avoid a collision. We have not a case here of a vessel being unable to stop and avoid a collision after actually hearing a fog signal. Cf. The Sagamore, 1 Cir., 247 F. 743. The D'Eon was entitled to know the presence of a vessel stopped in a fog in the immediate vicinity, even though it could not be possible to determine its exact location. And this is so even though The D'Eon knew generally that vessels were in the vicinity. "As a practical matter, * * *

---

[1] The master of The Mary E. D'Eon, testifying in court, seemed to have no difficulty in answering questions of counsel.

there is a difference between the general probability that vessels may be in the vicinity and the special probability of meeting a vessel whose presence is known though her exact location is not; * * *." The Sagamore, supra, 247 F. page 751. It is certainly reasonable to suppose, as has been stated, that the master of The Mary E. D'Eon would have cut down his speed to a safe rate had he been warned by signals that another boat was stopped in a dense fog in the immediate vicinity. That is obviously the purpose of signals: to warn other vessels of lurking dangers and give them an opportunity to avoid such. The danger here, the evidence shows, could have been avoided if The D'Eon had been warned of the presence of the stopped Eldridge.

■ Both vessels were at fault, and the fault of both contributed substanially to the collision. Damages as assessed by a commissioner to be appointed by this court will be divided equally between the parties. Union Steamship Co. v. New York & Virginia Steamship Co., 24 How. 307, 313, 16 L.Ed. 699; The Albatross, D.C., 273 F. 285.