## THE DAVID DOWS.

*(District Court, N. D. New York. 1883.)*

1. ADMIRALTY LAW—COLLISION AT SEA—INEVITABLE ACCIDENT.
    A collision of vessels in a severe and sudden gale, which, by proper and skillful seamanship in conformity with the rules of maritime law, might have been avoided, is not fairly attributable to inevitable accident.

2. SAME—BURDEN OF PROOF.
    The burden of proof, in an action to recover for loss caused by a collision at sea, rests with the libelants, who must establish the affirmative by a fair preponderance of evidence.

3. SAME—DIVISION OF LOSS IN CERTAIN CASES.
    Where a collision by vessels was owing to the negligence of each, though it may be in unequal degrees, the loss should not fall wholly upon one. The law provides for a division of loss in three cases: Where the fault is inscrutable; where there is no fault on either side; and when both parties are guilty of negligence.

4. SAME—CONTRIBUTORY NEGLIGENCE—RULE IN ADMIRALTY.
    The rule of the common law that contributory negligence prevents a recovery is not applicable in admiralty.

In Admiralty.

*Benjamin H. Williams* and *George S. Potter*, for libelants.

*George B. Hibbard, Edward Bissell*, and *W. S. Thurstin*, for claimant.

COXE, J. This is a collision case. The libel was filed by the owners of the schooner Charles K. Nims, alleging that their vessel, with her cargo, was sunk and totally destroyed by reason of the negligence and unskillful seamanship of the officers and crew of the David Dows.

The Nims was a three-masted schooner, 163 feet in length and 493 tons burden. The Dows is a five-masted vessel, 265 feet in length, 1,418 tons burden, and has two center boards.

On the evening of September 10, 1881, the two vessels and a third —the John B. Merrill—were sailing down Lake Erie, near Point Pelee island, bound for Buffalo. All three were on the starboard tack, sailing parallel courses, E. by S. ½ S. The wind was S. or S. by W. The Dows was ahead of the Nims a half or three-quarters of.

a mile, and the Nims was about the same distance ahead of the Merrill. The Nims was bearing about a point off the starboard quarter of the Dows, and the Merrill held substantially the same position with regards to the Nims. The other two vessels were to the windward of the Dows. Each was loaded and had all canvas set. About 8 o'clock there was a sudden shift of wind. A heavy squall from the W. or W. by N., almost without warning, struck the vessels nearly due aft. The first effect of the wind was to make the vessels broach to several points, heading them somewhere about S. or W. by S. Immediately thereafter the Nims commenced to fall away, and at the time of the collision was within a point or two of her compass course. The Dows, however, did not fall away, but kept her southerly course, and from seven to ten minutes after the first appearance of the gale her starboard bow came into collison with the port bow of the Nims, making a wound which caused the latter to sink in deep water. Immediately preceding the collision, within a moment or two, the wheelsman of the Nims put her helm hard a-port, the effect being to bring her up a point or two; and yet the witnesses substantially agree that the vessels met at an angle of nearly 45 degrees.

The night was smoky and there was some rain, but it was not very dark. Lights could be seen on the islands and main-land, but vessels could not be clearly distinguished over a half a mile distant.

Regarding the foregoing facts there is little controversy. The dispute commences with the attempt of the libelants to fasten responsibility upon the Dows. They insisted that she was in fault for the following reasons: *First.* She was improperly constructed, being fitted with five masts,—an unusual number,—and "patent halyards," which are apt to become disordered in sudden emergencies. She was one of the largest sailing vessels navigating the lakes. She was an experiment. *Second.* She was insufficiently manned. Her crew consisted of but seven men, a master, and two mates,—ten in all. *Third.* She was negligently and unskillfully maneuvered. The lookout was not in his proper place. The master did not attend to his duties, but performed the labor of a common sailor. The crew were improperly disposed about the vessel. The sails which should have been left in position were taken in, and those which should have been taken in were allowed to remain.

These allegations of the libelants are vehemently combated by the claimant, who insists that his vessel was blameless, and that the disaster was caused either by the fault of the Nims, or was the result of inevitable accident. Applying to the proof the rule of maritime

law as enunciated in numerous controlling decisions, and it would seem that this collision can hardly be attributed to inevitable accident. It might have been prevented, notwithstanding the sudden and severe gale, which was hardly a sufficient or approximate cause for all that happened. Is it not true that the danger would have been averted if proper measures had been seasonably taken, if good judgment and good seamanship had combined, and if the requisite skill had been displayed before the peril was so near that all precautions were too late?

The next question to be considered is, was the Dows at fault? And here the burden of proof is upon the libelants; they must establish the affirmative of this proposition by a fair preponderance of evidence. It would be an idle and unprofitable task to attempt a general criticism of the Dows—her construction and management. It is wholly immaterial how negligent she may have been, unless that negligence promoted, or tended to promote, the accident. Thus, all questions relating to her patent halyards, the number and size of her masts, etc., can be laid out of the case. It may, perhaps, be said that these peculiarities should have compelled greater diligence and caution on the part of her crew, the Dows being in some sense an experiment, and her behavior in all circumstances and exigencies not having been fully ascertained. But it is very clear that there is not sufficient evidence of which to predicate a finding of faulty construction which contributed in any appreciable degree to the disaster. The allegation that the crew was insufficient in number may also be summarily disposed of. Although the experts of the libelants were, perhaps, better able to express an intelligent opinion upon this question than those called by the claimant, because of their more extended experience in navigating vessels of the larger class, yet the contention between them is not important when it is remembered that at the time of the accident the difficulty was not that the crew was too small, but that wrong and inadequate measures were adopted. It is in proof that when the squall struck the vessel all hands were on deck, it being the hour for changing the watch. There were, therefore, men enough, according to the evidence in this case, to do all that good seamanship required.

The remaining inquiry regarding the Dows is, was she properly handled?

All the witnesses agree that in such an emergency safety imperatively demands—*First*, that the wheel should be put hard up; and *second*, that the after canvas should be taken in. Thus only can a

vessel be kept on her course. The whole force of the wind striking the after canvas, the forward sails are practically becalmed, and the tendency is, even as against her helm, to turn the vessel's head into the wind. When once in this position great difficulty is experienced in getting her back upon her course. Prompt and decisive action is required; a mistake at the outset may prove fatal.

There is no controversy over the proposition that it was the duty of each master to keep his vessel on her course, and if off, to bring her back again as speedily as possible. Every effort should have been directed to that end. Being to windward, the Nims was required to keep out of the way of the Dows; but it was equally the duty of the Dows, if she wished to take advantage of any dereliction of the Nims in this respect, to keep her course. If the vessel to leeward suddenly changes her course and runs at right angles to it and directly across the track of the vessel to windward, it may well be doubted whether navigation rule No. 17 has any binding application.

The Dows was off her course. The libelants allege that this result was produced by the neglect of her crew to do what, as has been seen, was of prime necessity, viz., lower immediately her after canvas. There is, of course, great conflict of testimony on this question, but it is thought that the weight of evidence is with the libelants.

*First.* The account given by the witnesses who were aboard the Nims is corroborated by the testimony of several witnesses who were on other vessels—the tug Winslow and the Merrill—at the time of the collision.

*Second.* There is a very marked disagreement among the claimant's witnesses—the crew of the Dows—as to what actually was done. Some assert that the sails were taken from the three after masts; others, that the fifth mast, or spanker, alone was denuded. Two witnesses insist that there was an effort made to square the yards; the rest deny it. And there are various other statements of minor importance regarding which they are at variance.

*Third.* The action of the master in ordering the foretop-gallant-sail to be taken in was a grave error. That this was done is not denied, and there is little attempt made to justify it. This sail—the highest on the foremast, and for that reason less likely to be becalmed—would doubtless, in proportion to its size, have exerted more influence in keeping the vessel's head away from the wind than any other. Not only was this command given, but in order to execute it several of the men were removed 150 feet or more from the after-

part of the vessel, where it is quite certain their services were most required.

*Fourth.* The behavior of the vessel is strongly corroborative of libelant's theory. It is in proof, and undisputed, that the Dows was easily handled, and promptly answered her helm; and yet it appears that she ran nearly a mile, at almost right angles with her course, resisting every effort of her helmsman to keep her away, helpless and unmanageable. How can this conduct be accounted for except upon the theory that sufficient after canvas had not been taken off. Why did she not fall away? Why did she not answer her helm?

I must conclude, then, that the Dows was at fault.

The remaining inquiry is: Was the Nims at fault; did her conduct in any way contribute to the accident? It is contended by the claimant—*First,* that she was improperly manned, her crew consisting of but five men, three officers, and a steward,—nine in all; *second,* that after the vessels came up, heading south, the Nims, owing to the dangerous proximity of the Dows, should have run off to the south, under the stern of the Merrill, and so have avoided both vessels; *third,* that the statute imposed upon the Nims the duty of keeping out of the way of the Dows, and instead of observing this statutory requirement her sole attention appears to have been directed to the Merrill; *fourth,* that there was no sufficient lookout on the Nims, as evidenced by the fact that the Dows was not seen until the peril was imminent, if not unavoidable; that if the helm of the Nims had been put down a moment or two sooner, the vessels would have gone clear.

Other acts, of which negligence is predicated, are alleged, which it is unnecessary to consider; for—like many of the accusations against the Dows—they cannot, to any appreciable degree, be connected with the accident. The Nims was in a situation of extreme danger. She was occupying a position between two vessels whose courses, originally not over a mile apart, were converging almost at right angles. She had a double duty to perform—to keep out of the way of the Dows, and also, with reference to the Merrill, to keep her course. If the Nims had continued on the southerly course she first took after the squall struck her, and collision had occurred with the Merrill, she would have been in no position to claim the advantage of the rule quoted, which is based upon the assumption that the vessel to leeward keeps her course. It was then the duty of the Nims, as it was of the other two vessels, to endeavor to resume the former course as

speedily as possible, "due regard being had to all dangers of navigation, and to any special circumstances  *   *   *  rendering a departure  *   *   *  necessary in order to avoid immediate danger." The Nims was nearer to her course than either of her companions, and though at the time of the accident she had not exactly recovered, being headed a point or two to the southward, yet her position was more favorable for avoiding a collision with the Dows than if she had been steering E. by S. ½ S. But a vessel, though placed in peril by the fault of another, should not doggedly and persistently continue upon a line of conduct, which in ordinary circumstances, would be both practically and theoretically correct, if danger can be avoided by simple and ordinary precautions.

Is the Nims amenable to this criticism? This question must be answered in the affirmative, but not without some doubt and hesitation. Although placed in extreme peril by the negligent action of the Dows, the Nims could, it would seem, have avoided the collision had proper attention been paid to the former before it was too late. When the squall struck the vessels they were from a half to three-quarters of a mile apart, and from seven to ten minutes elapsed before the danger was impending. And yet no one seems to have apprehended trouble from the Dows until she was but a few hundred feet away. There was nothing in the state of the atmosphere to prevent her from being seen. She was seen from the Merrill, though the Merrill was about a half a mile further away. It was the duty of the Nims to keep out of the way of the Dows; and this imposed upon her the obligation of keeping a careful watch upon the latter's movements. Certainly she owed no higher duty in this respect to the Merrill than to the Dows. The lookout of the Nims could not be found, and was not produced at the trial. Though he was absent through no fault of the libelants, the court is still left to conjecture what he saw, or neglected to see, of the Dows previous to his announcement, a moment before the collision, that she was luffing across the course. It was then too late. If he failed to see her, or having seen her, if he failed to report, in either case he was negligent. The wheel of the Nims was not put down till the moment of collision, when the vessels were but a few hundred feet apart, but, even in the brief space which elapsed, she came up a point or two. It is true that carrying only her head-sails she could hardly have been expected to answer a port helm readily, and yet she came up sufficiently to give assurance that if another minute had been allowed

the vessels would have escaped. The Nims could have luffed, and passed under the stern of the Merrill, she being a quarter of a mile away and nearly abreast.

From the moment that she recovered from the first effect of the wind the Nims commenced swinging to leeward, directly towards the Dows. She continued to do so until it was reported that the latter was crossing her bows. In ordinary circumstances, with the Dows absent, this would doubtless be considered good seamanship, but with the Dows present and but a short distance to leeward, it cannot be so regarded. If, then, negligence can be imputed to both vessels, though in unequal degrees, the loss should not fall wholly upon one. The law, in its wisdom, provides for a division in three cases: *First*, where the fault is inscrutable; *second*, where there is no fault on either side; and *third*, when both parties are guilty of negligence. The rule of the common law that contributory negligence prevents a recovery is not applicable in admiralty.

Regarding the principal issues in controversy, it cannot be denied that any deduction from the evidence is surrounded with perplexities and involved in doubt. The peculiar position of the vessels, the sudden approach of the hurricane, the confusion incident thereto, the intense excitement of the moment, the brief time allowed for thought or action, are circumstances which make this case an anomalous one, rendering the search for a controlling precedent almost a fruitless task. And yet, in view of the circumstances, it is thought that the disposition of the case above suggested is the most equitable that can be made.

It follows that a decree should be entered providing for a division of the loss, when ascertained, and for a reference to compute the amount of the damages.