### THE EDMUND MORAN.

#### (District Court, S. D. New York. October 14, 1909.)

COLLISION (§ 66*)—TUG AND TOW—EVIDENCE.

A collision between a navigating tug and a canal boat in tow on a hawser occurred off the Battery. No defence was offered by the tug excepting one of inevitable accident, claimed to have arisen through the breaking of a wire cable forming part of the steam steering gear. *Held* that the testimony showed lack of care in the examination of the cable from which plain defects arose, and the defence could not be sustained.

[Ed. Note.—For other cases, see Collision, Dec. Dig. § 66.*]

(Syllabus by the Judge.)

Action by John Newman and others against the steam tug Edmund Moran. Decree for libellants.

James J. Macklin, for libellants.
Carpenter, Park & Symmers, for claimant.

ADAMS, District Judge. This action was brought by John Newman, owner of the canal boat Bronx, and Thomas Hamilton, her master, to recover against the tug Edmund Moran, the damages they suffered through the sinking of that boat and the loss of the master's personal effects on board, by collision with the tug off the Battery on the 14th of May, 1908. The boat had her stern cut off, causing damages to her owner, in an alleged amount of $1,750, and the master suffered from the accident, it is said, the sum of $150. The boat was in tow on a hawser of the tug Glencove and proceeding slowly around the Battery to Newtown Creek, Long Island. There was no fault on the part of the Glencove or the tow and the Moran is clearly liable unless her claim of inevitable accident is sustained. She alleges as follows:

"VIII. About 6:15 P. M. May 15th, 1908, the weather being clear and little or no wind, the steamtug 'Edmund Moran' left the Battery Landing bound for the steamtug, 'Eugene F. Moran,' which was coming in from sea with a tow. The tide was flood and the wind northeast. When the 'Edmund Moran' left the Battery Landing she was heading to the westward. The wheel of the 'Moran' was put to starboard in order to go out into the river. A competent pilot was in charge of the navigation of the 'Edmund Moran'; a deckhand was forward upon the lookout. The 'Edmund Moran' left the Battery Landing with her wheel partly to starboard and proceeded under one bell. After

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

the said steamtug 'Edmund Moran' had passed under the stern of a Pennsylvania steamtug with a barge alongside on her port side, the steamtug 'Glencove' was somewhat to the southward of the 'Edmund Moran' between the Battery and Governors Island proceeding up the East River. The 'Glencove' had three canal boats in tow, two of which were on two hawsers in the first tier and one boat made fast close behind the second tier. After passing the Pennsylvania steamtug the wheel of the 'Edmund Moran' was put to port in order to go under the stern of the 'Glencove's' tow. The 'Moran' was proceeding slowly under one bell. The 'Moran' failed to answer her port wheel and didn't sheer to starboard, whereupon bells were immediately given to stop and reverse and an alarm signal was given. The bells to stop and reverse were answered immediately. Before the headway of the 'Moran' was entirely stopped she struck the last boat in tow of the 'Glencove' causing her to sink. This canal boat was laden with coal. The collision occurred nearer the New York shore than Governors Island. An immediate examination was made of the steering gear of the 'Moran' when it was found that the wire or cable connection running from the steering engine to the chain on the port side, which was placed in a box, was broken. This wire or cable was made of a large number of small wires. The wire was new having only been used upon the boat but one month and there had been no indication of any inherent defects in it. The steering gear of the 'Moran' had been regularly inspected two or three times a week and there was no apparent defect in the steering gear. In answer to the alarm signals of the 'Moran' the Revenue Cutter 'Calumet' came alongside and made fast to the 'Moran' and towed her back to the Battery Landing.

IX. Said collision was not produced by any negligence or fault upon the part of the 'Edmund Moran' or those in charge of her, but was wholly produced by the perils of the sea and was an inevitable accident. There was no apparent defect in the steering gear of the 'Moran' which could be observed by any inspection. That the breaking of said steering gear was due to a latent defect and was not caused or produced by any negligence upon the part of the said 'Moran.' or those in charge thereof."

The cable was ¾ of an inch in diameter and 2¼ inches in circumference, and was no doubt of ample size. It was bought on March 23d and put on the boat within 2 or 3 days. It was therefore less than 2 months old at the time of the accident and should have been in good order, as the life of these cables was generally at least 4 months. It was composed of six strands of seven wires each making in all 232 wires. The interior was of hemp. It broke in a box opposite the engine room on the port side, through which it passed in going to the quadrant of the rudder.

It was stated by the Moran that the cable was examined twice a week, Mondays and Thursdays, sometimes Fridays, by the mate and a deck hand, by opening the boxes, turning the wheel hard-a-starboard and then hard-a-port and running the fingers along the wires to determine if there was any rough surface. Those called on behalf of the Moran said there were no defects observable in the cable.

A witness, however, of some experience, the superintendent of a shipyard, was called by the libellant, who examined the cable in court and said that he found evidences of weakness in several places, which he pointed out. He said:

"You can see by the outside where it gets worn by traveling on the sheaves: it is shown by the appearance, and also by the feeling. * * * It appears to have been worn for some time. Q. What is there to tell you that? A. The wear—the wear of the rope; that is the amount of wear on the strands; on the wire itself. * * * Q. Will you point out where it is, showing us a defective condition? A. Yes, sir. Here is one place here between these little strands, the outside strands of the wire. Q. Well, the wire didn't part where

you have got your finger, did it? A. No, but it shows that it has been worn; and this point where it has parted was its weakest point. * * * Q. You rub your fingers over this cable where there is a great deal of oil and grease? A. Yes, sir. Q. And you think you can find something connected with it to show that it was worn; what is that something? A. Well, the wearing of the rope itself shows that it has considerably more wear at these points. Q. Does it turn up any rough edges about it; do you feel any rough edges where this wear has taken place? A. Yes sir, on these strands; some of them are very rough. Q. Which strand are you testifying about? A. Right where the rope is greased. Q. Where do you find any edges turned up on those strands; you put your finger on the spot where you say the outside is right in the immediate locality of where the strand parted before the collision, and tell me where there is any indication of defective condition of this rope? A. Here is a place right (indicating the place); and here is another one, and here is another one; the wire is parted here, and here is another one. Q. What did you find there; you have indicated that you found this and that and the other; what did you find? A. I found the wire broken. Q. Will you point out to the court where those wires are broken? A. Yes, sir, these strands at this point here, are all broken; that is, the wires; and here is another one; there are two or three broken there, and here are two or three. Q. What do you call what is broken? A. The center strand of the wire; the wires that make up the strands. Q. You mean the center wire under the strand? A. Yes sir. Q. Do you know how many wires make up the whole rope? A. I don't know just how many there are. Q. How many do you think there are? A. Around two hundred or more.

By the Court: Q. How far is the place that you think is defective from the place where it broke? A. It appears to be about ten feet."

An inspection of the cable offered in evidence fully sustains this testimony. It is a clear case of Res ipsa loquitur.

I doubt very much if the examination was made once or twice a week, as claimed, but in any event, the defects which must have existed were not discovered. The claimant admits that cables of this character need constant watchfulness and doubtless when that is given they can be safely used but in its absence they are liable to break and cause damage.

There will be a decree for the libellants, with an order of reference.