## THE TERJE VIKEN.

## THE BARAVIA.

(District Court, E. D. Virginia. March 27, 1914.)

COLLISION (§ 71*)—ANCHORED VESSELS—INSECURE ANCHORAGE.

A steamship, light and having an unusually high free board, and a whaleback barge loaded with coal, were anchored near each other on the west side of Elizabeth river, where they had been for two days, the barge anchoring last. Both vessels were tailing downstream with an ebb tide when a very strong wind came up from the northwest, driving the steamship back against the tide, where she came into collision with the barge which was not affected by the wind. *Held*, on the evidence, that the barge on anchoring left sufficient room for the other vessel, and that the collision arose through the fault of the steamship in putting out only one anchor, which dragged, and in any event in not dropping another when the storm came up.

[Ed. Note.—For other cases, see Collision, Cent. Dig. § 101; Dec. Dig. § 71.*]

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

In Admiralty. Suit for collision by A. Harbitz, master of the steamship Terje Viken, against the barge Baravia. Decree for respondent.

Hughes, Little & Seawell, of Norfolk, Va., for libelant.
Hughes & Vandeventer, of Norfolk, Va., for respondent.

WADDILL, District Judge. On the evening of the 2d of October, 1913, about 5 o'clock, the steamship Terje Viken, hereinafter called the "steamship," and the barge Baravia, hereinafter called the "barge," were at anchor in the waters of the Elizabeth river, on the western side of the channel, about opposite piers 1 and 2 of the Norfolk & Western Railroad at Lambert's Point, Va. The steamship came to anchor on the morning of September 30th, about 7:30 o'clock, and the barge either that evening, or the morning of the next day; the evidence not being clear on that point. The two vessels remained at anchor until the time of the accident. The steamship, 335 feet long, was light, and, by reason of its construction, about 20 feet out of the water. The barge was what is known as a "whaleback" or pig barge, and was heavily laden with coal, having only some three or four feet freeboard. The tide was running strongly ebb, and the two vessels were tailing downstream, when a sudden and violent windstorm came up from the northwestward, blowing for a short time at considerable velocity, which caused the steamer, high out of the water, to be blown around against the tide; whereas the barge, low down in the water, and not affected by the wind, continued to tail downstream, causing the vessels to collide, one being tide-rove and the other wind-rove; and as a result each vessel sustained injury, the steamer much the more serious.

Sundry faults are alleged by the two vessels one against the other, and the case turns entirely upon whether the accident was the result of the failure of the barge, which last came to anchor, to give to the already anchored ship sufficient berth room, or whether the steamship dragged her anchor when subjected to the force of the violent windstorm, and in that way came into collision with the barge.

The law applicable to the case is well settled (The Juniata [D. C.] 124 Fed. 861) that the obligation imposed on the vessel last coming to anchor is to give ample berth room to one lying at anchor, and, if the barge on this occasion failed in this respect, she is clearly liable. Whereas, if the occurrence came about as the result of the failure of the steamship to safely anchor, or provide increased and other anchorage appliances in contemplation of an impending storm, then she is liable.

After much consideration of the testimony, the conclusion reached is that the preponderance of the evidence clearly shows that at the time of anchoring, two days before the collision, the barge did allow ample room for the steamship to swing. They had been in that position during the turn of certainly three or four tides, and had encountered no difficulty until the storm arose. It is true, in the absence of the violent storm, each vessel was influenced by and turned with the tide; whereas, in the storm the barge swung with the tide one way, and the steamship was blown the other. Nevertheless, the court thinks that the tes-

timony shows that the space allowed was sufficient for the double swing under ordinary circumstances, and that the accident came about not as the result of the original anchorage, or any failure on the part of the barge to perform its duty at the time of the accident, but because of omissions on the part of the steamship to properly and timely perform her duty, as well in the manner of her original anchorage, as her neglect to take extra precautions in the face of the impending storm, especially as it was apparent that her then anchorage was insufficient. The steamship was greatly exposed by reason of her unusual freeboard to a storm such as then prevailed, and she should have anticipated the effect of the wind when she came to anchor, and have put out both anchors, whereas she dropped only one, and that on a chain of only 15 fathoms, which caused her to drag down upon the barge. A longer anchor chain would have lessened the probability of the anchors letting go by the turning of the ship, and with only one anchor out, clearly another should have been cast, and as a matter of fact her port anchor was in the act of being turned loose when the collision happened. It was not, however, dropped, and at no time was there but one anchor out, when good seamanship and prudence required two.

The conclusion of the court therefore is that this failure on the part of the ship as well to make suitable anchorage in the beginning, as to increase and strengthen the same when the emergency came, brought about the collision, and not the lack of sufficient anchorage room.

Sight is not lost of the fact that the ship claims that the squall was so sudden that it was impracticable for her to cast the additional anchor in time to have been of use, had it been thought necessary; but the court thinks the evidence establishes the contrary to be the fact, and that ample warning of the approach of the storm was afforded, and additional precautions should have been taken to secure her safety, as was done by other shipping in the vicinity.

It follows from what has been said that the libel will be dismissed at the cost of the libelant.