STATE ROAD DEPARTMENT OF FLORIDA et al. v. UNITED STATES.

Civ. No. 278.

United States District Court
N. D. Florida, Pensacola Division.

July 31, 1949.

See also 78 F.Supp. 278.

J. McHenry Jones, Herbert Latham, Joe J. Harrell, Pensacola, Fla., John W. Mc-

Whirter, Tampa, Fla., **T.** Paine Kelley, Tallahassee, Fla., for plaintiffs.

Fowler, White, Gillen, Yancy & Humkey, Tampa, Fla.; George Earl Hoffman, U. S. Atty., Pensacola, Fla., Eugene F. Gilligan, New York City, for defendant.

WALLER, Circuit Judge, designated and sitting as District Judge.

This is a suit by the State Road Department of Florida and its property damage insurance carrier, Aetna Insurance Company of Hartford, Connecticut, as partial subrogee, plaintiffs, against the United States to recover damages to the Thomas A. Johnson Bridge across Pensacola Bay, Escambia County, Florida, caused when the bridge was struck by the S.S. Josiah Snelling, S.S. Walter Raleigh, S.S. Henry H. Blood, and S.S. Lyman Abbott, on the night of May 19–20, 1946, during a severe rain and wind squall in Pensacola Harbor where those ships were at anchor.

The damage to the bridge was partially covered by insurance policies issued by Aetna Insurance Company to the State Road Department, by virtue of which the Insurance Company paid to the Road Department the sum of $215,000 in full settlement of its liability and for which amount, after being brought into the case as a plaintiff on motion of all parties, it seeks to be subrogated and paid out of any judgment rendered against the defendant in this cause.

The suit was brought under the Federal Tort Claims Act, 28 U.S.C.A. § 2671 et seq., alleging numerous grounds of negligence on the part of the officers and members of the crew of the above-named vessels, and the law applicable is, therefore, the law of negligence of the State of Florida wherein the collision occurred rather than the law of admiralty, even though the factual background is decidedly maritime in character.

### Findings of Fact

The following uncontroverted facts are hereby found:

1. There were approximately forty ships in the Pensacola Harbor on the night of May 19–20, 1946, of which twenty-one were liberty ships anchored in the harbor rather than moored to the docks.

2. That these liberty ships were all light, or, that is, without cargo or ballast, rendering them much more difficult to handle in a high wind than if they had been loaded.

3. That a liberty ship is approximately 450 feet long and, when light, a large freeboard surface is exposable to the wind with a correspondingly small surface beneath the water line, with the result that some of the rudder and some of the propeller are out of the water and not fully efficient for steering, navigating, or maneuvering.

4. That Pensacola Harbor is a large, deep, landlocked harbor, lying between the mainland on the north and west and Santa Rosa Island on the south, and because of its location and bottom of deep, soft mud, into which ship anchors sink deeply and usually hold firmly, the harbor is regarded as exceptionally safe for the anchorage of vessels.

5. Traversing Pensacola Bay and bounding the harbor on its eastern side is the Thomas A. Johnson Bridge, a concrete structure, which is part of an arterial highway in the State road system, being a link in State Roads Nos. 1 and 53 (U. S. No. 98).

6. That the bridge was the property of Escambia County, Florida, but was under lease to the Road Department of the State, by the terms of which the Road Department was obligated to keep the bridge in operation and in repair, without expense to the County, in consequence of which the cost of repairs to the bridge fell on the State Road Department, rendering it entitled to any sums recoverable for any damages negligently caused to such bridge.

7. That on the night of May 19–20, 1946, a severe rain and wind squall occurred in the Pensacola Harbor with the result that the above-named liberty ships, together with the S.S. Harold T. Andrews, dragged anchor and collided with the highway bridge, causing minor damages at one point but substantial damages at three oth-

er places. For convenience the points on the bridge at which the ships struck will be designated as Points 1, 2, 3, and 4.

8. It was stipulated, and the Court finds, that:

(a) Point 1 on the bridge was struck by the S.S. Harold T. Andrews, causing damage in the sum of $465. Because the expense of making the proof would be greater than the damages plaintiffs have abandoned any effort to recover the damages inflicted at Point 1.

(b) Point 2 on the bridge was struck by the S.S. Josiah Snelling, the repair of which entailed an expenditure in the sum of $14,442.85, which included engineering and administrative expense in the sum of $737.85, which the Road Department allocated to the cost of repair at this point.

(c) Point No. 3 was struck by the S.S. Walter Raleigh, which went through the bridge broadside, causing damage in the amount of $151,238.61, if the engineering and administrative expense, allocated against the said work by the State Road Department, in the sum of $7,485.34, can be included as damages.

(d) The S.S. Lyman Abbott and the S.S. Henry H. Blood both collided with the bridge at Point No. 4 after the Lyman Abbott had struck the Blood, causing damages in the sum of $79,697.43, if the engineering and administrative expense, allocated against the said work by the State Road Department, in the sum of $3,944.51, can be included as damages.

(e) The bridge was rendered impassable by the collisions and detours were built around the breaks in the bridge at Points 3 and 4 at a cost to the State Road Department of $146,713.90. Cost of removal of temporary detour bridges was $15,000, making a total of $161,713.90, which, less salvage value, amounted to $146,037.02, which included Tallahassee office overhead expense allocated against said temporary repairs in the sum of $17,610.63. [The Defendant says that even if it is liable for the damages done to the bridge, it is not liable for the cost of either the engineering, overhead, or the cost of constructing or removing the detours.]

The Court finds the amounts of these engineering and overhead charges to be reasonable.

9. Each of the liberty ships was brought into the harbor by Pensacola Harbor Pilots, by whom anchoring berths were assigned and the Master of each vessel was advised as to the type of holding ground in the harbor and that one anchor, with three shackles of anchor chain in the water, was sufficient to hold the ship in ordinary weather. Each vessel was so anchored as to permit the vessel to swing completely around without striking any other vessel anchored in the harbor; that is to say, that each ship of 450 feet in length and having three shackles, or 270 feet, of anchor chain in the water, totalling 720 feet, must have considerably more than twice that distance between it and any other ship having the same length and number of shackles in the water in order to allow the paying out of additional chain in rough weather and so that such ships would not come into collision in the event both of such ships should swing simultaneously in opposite directions.

10. That the weather forecast by the Weather Bureau of the Department of Commerce for Sunday, May 19, 1946, was: "Cloudy, with showers and thunderstorms tonight and Monday. Moderate southerly winds. Special wind warning, none." No storm warnings of any character were given by the flying of pennants, or otherwise, during the day or night of May 19.

11. That between 1 and 2 o'clock on the morning of the 20th a severe wind, accompanied by a thunderstorm and heavy rain, struck the harbor, causing fourteen of the liberty ships to drag anchor and five of them to strike the bridge. Two others, out of the fourteen, collided with the S.S. John W. Burgess. Two other vessels not belonging to the Government, tied to the dock, broke away from their moorings. Seven of the liberty ships apparently did not drag anchor.

12. Each of the four ships, Josiah Snelling, Walter Raleigh, Lyman Abbott, and Henry H. Blood, maintained steam on one of the two boilers of the ship during

anchorage in the harbor at pressures from 150 to 200 pounds, but it was customary not to turn steam on the main engine while a ship was at anchorage except when it became necessary in an emergency to bring her bow into the wind or to otherwise maneuver or navigate the vessel. The process of getting the main engine ready to put out to sea usually required approximately an hour but in an emergency it was possible to turn steam on the main engine so as to operate it in fifteen to twenty minutes.

13. In addition to the forty vessels and the highway bridge, there were several docks that projected out into the harbor at approximately right angles to the shore.

14. The United States Naval Air Station is located to the southwest of the harbor approximately three miles from the bridge, and it was apparently directly in the path of the windstorm, where the conditions of the weather, the velocity of the wind, etc., were noted by trained Navy personnel throughout the night and during the storm. Its instruments revealed that for a period of some fourteen minutes the wind, coming in gusts, reached a maximum velocity of fifty-two knots per hour in several of the gusts. The wind velocity was automatically recorded by an anemometer on graphs which are in evidence.

15. No damage whatever was done to any building, roofs, or shore installations along the water front or in the harbor.

16. The fulcrum on the windlass on the starboard anchor of The Josiah Snelling was broken prior to May 11 and at the time of the storm was in a machine shop in Pensacola where it had been taken on May 11 for repairs. The repairs were completed and the fulcrum replaced shortly after the storm. In the absence of this fulcrum the starboard anchor could be dropped but could not be heaved by the ship's own power or devices, or without outside and troublesome aid. As a consequence The Snelling did not cast out an additional anchor during the storm.

17. It is generally conceded, and I find, that proper seamanship requires that a watch of not less than a licensed deck officer, an A. B. seaman, a fireman, and a licensed engineer, be maintained at all times when a ship is anchored in a harbor, and steam is to be kept up, as was the case here.

18. The following aspects of a thunderstorm have been definitely shown by substantial evidence:

(a) That a thunderstorm or squall usually covers a relatively small area and the Weather Bureau does not undertake to chart the time of occurrence, the course, or the intensity of such local phenomena.

(b) That a thunderstorm is often accompanied by high winds but it is impossible to forecast or to tell the strength of the wind that will strike at any given point at any appreciable time before it strikes, although there are many signs to one experienced in observing thunderstorms and squalls that are sufficient to indicate their approach and something of their character and to suggest the taking of appropriate precautionary measures by mariners in preparation therefor.

(c) That a licensed deck officer of a vessel should be weather conscious and conversant with weather conditions that might affect the safety of his, or other, vessels, or installations in close proximity.

(d) That a definite shifting of the wind, a noticeable increase in the velocity of the wind coming from an area where there is vivid lightning, a lowering of heavy clouds that overcast the sky, low, fast-flying scud clouds approaching in the direction of a vessel, are generally recognized by mariners as indicative that a squall or thunderstorm is in the making, out of which dangerous winds may come.

There are other salient general facts that are without dispute but a recital thereof can be more appropriately made in connection with a separate statement of the acts and doings of the four vessels that came into collision with the bridge.

I also find, from a preponderance of the credible evidence, the following facts:

1. That clouds began to gather in the southwest, together with occasional flashes of lightning, around 10:30 o'clock and be-

fore midnight the sky had become overcast, the clouds thicker, the lightning more frequent, indicating that a thunderstorm or squall of some character was making up in the southwest. There was some increase in the wind as the night wore on and a shifting of the winds from southeast to southwest. By 12:30 that night the overcast clouds had lowered and low, fast-flying scud clouds were discernible, and weather-conscious persons, having the knowledge that a licensed deck officer has, or ought to have, of thunder storms and squalls, should have been able to anticipate that a thunderstorm or squall was approaching, and that wind of some velocity was apt or likely to occur.

2. Between 1:00 A.M. and 1:25 A.M. the wind had increased in gusts to 30 or 35 knots per hour, and between 1:25 A.M. and 1:40 A.M. it had increased in gusts to 52 knots at the United States Naval Air Station approximately 3 miles southwest of the harbor and directly in the path from which the storm came. The 52-knot gusts lasted, according to the Air Station records, one-half minute. The 45 to 49-knot gusts lasted 2½ minutes. The 40 to 44-knot gusts lasted two minutes. The 35 to 39-knot gusts lasted 2½ minutes. The 30 to 35-knot gusts lasted 10 minutes. [Seemingly the peak of the gusts reached the harbor at approximately 1:30 A.M.] The evidence convinces me, however, that the wind gusts in the harbor of Pensacola where the ships were at anchor reached intermittent velocities of 40 to 75 miles an hour for a period of approximately 15 minutes. All of the experienced mariners who were interrogated on the subject stated, in effect, that winds coming in strong, intermittent gusts, which then subside momentarily, are more apt to cause a vessel to break out and drag anchor than were the wind to be steady and have the same velocity as at the peak of the gusts, since the slackening of the wind causes the ship to slack off on its anchor chain so that the succeeding gust will give the ship a jerking force. The squall in the harbor that night was of that type, which accounts for the fact that a number of ships broke out and dragged anchor. No damage whatsoever was done to the wharves, docks, or property on the shore in Pensacola or on Santa Rosa Island, indicating that the storm traveled a narrow path. I believe the evidence establishes the fact that the wind increased in velocity between the time that it passed over the Naval Air Station and the time that it struck the vessels in the harbor. There is a great disparity in the testimony of witnesses and of the logs of the vessels in the harbor as to the peak velocity of the wind, as well as to the exact time at which it occurred. In the footnote below is the estimate of the rate of speed of the wind by a number of the witnesses who were in the harbor at the time of the squall.[1] The logs of the vessels involved in the collision do not all show the speed of the wind at the height of the storm. The estimates shown in the footnote below as to the velocity of the wind at some time between the hours of 1:00 and 2:00 A.M.,

1

| Name | Ship | Position | Wind (M.P.H.) |
|---|---|---|---|
| Louis E. Moretto | Abbott | Third mate | 65–70 |
| A. Ekke | " | Captain | 75–100 |
| E. Huppler | Blood | Chief Mate | 55–75 |
| H. R. Blomberg | Raleigh | Captain | 75–90 |
| B. K. Bays | " | Third Mate | 60–75 |
| P. Bayless | " | Deck | 75 |
| T. H. Shea | Burgess | Captain | Above 75 |
| W. C. Boyett | Snelling | Chief Mate | 47–52 |
| P. J. Besotes | " | A. B. | 60–65 |
| R. Gunderson | " | Captain | 55 |

[There were other witnesses who testified as to the speed of the wind whose testimony in this respect is not found in any notes that I made at the trial, and the transcript of the testimony is not yet available.]

as noted in the logs of the five vessels involved in the collision,[2] as well as the logs of other liberty ships in the harbor at the time,[3] are of interest, and are generally less than the speed estimated by the deck officers who testified as witnesses in the case.

The velocity of the wind in the harbor as same is shown by the logs of the several vessels was entered on the night of the storm and about the time of its subsidence. These logs are required by statute[4] to be maintained and because of the fact that the things set out therein were fresh in the minds of the officers making the entries, while the testimony was given three years after the occurrence by some of the masters and deck officers of the vessels and may have been influenced somewhat by faulty recollections and by an understandable desire to protect their reputations as ship's officers, I have given considerable weight to the statements in the logs. On the other hand, I have given much consideration to the fact that the gusts of wind were of sufficient strength and duration to cause at least fourteen of the liberty ships to break out of the good holding ground of Pensacola Harbor and to drag anchors of several considerable distances from their anchorages. Without doubt there was a windstorm which struck rather quickly and with much force on the occasion in question.

3. I find also that the squall was accompanied with a hard and blinding rain which practically destroyed visibility and any opportunity for the deck watch to judge from shore installations, lights, or bearings whether or not the ship was dragging anchor. All of the officers interrogated on the subject agreed that there are three general methods of determining whether a ship is dragging anchor, namely: (a) by feeling the anchor chain to see whether it was quivering as is usual when the anchor drags along the bottom; (b) by taking bearings on, or visualizing, stationary objects; (c) by dropping a leaded line overboard to the bottom. There is divergence of thought as to the efficacy of the last method. It was also generally recognized by all of the experienced mariners who testified that: (1) It is much easier to prevent a ship from dragging anchor in a storm by taking precautions before the anchor is broken out and the ship has begun to drag than to fetch up the ship after it has begun to drag. (2) In case of light ships at anchorage, in a storm such as the one in Pensacola Harbor that night, it is generally deemed necessary to: (a) Maintain an alert deck watch composed of at least a licensed deck officer

2

| Name of ship | Hour | Wind (M.P.H.) |
| --- | --- | --- |
| S. S. Harold T. Andrews | 2:00 A. M. | 47–54 |
| | 2:10 A. M. | 55–63 |
| S. S. Henry H. Blood | Hour not definite | 47–54 |
| S. S. Lyman Abbott | 1:00 A. M. | 8–12 |
| S. S. Walter Raleigh | 1:15 A. M. | "Strong gale" [A gale is 39–54; whole gale is 55–75] |
| S. S. Josiah Snelling | 1:32 A. M. | 47–54 |

3

| Name of ship | Hour | Wind (M.P.H.) |
| --- | --- | --- |
| S. S. Button Gwinnett | 1:30 A. M. | 32–46 |
| S. S. Lucretia Mott | 1:30 A. M. | 32–38 |
| S. S. Salmon P. Chase | 2:00 A. M. | 39–46 |
| S. S. Stephen Girard | 2:00 A. M. | 32–38 |
| S. S. Louis Sengteller | 2:00 A. M. | 55–63 |
| S. S. Tabitha Brown | 2:00 A. M. | 39–46 |
| S. S. Wm. Lyon Phelps | 2:00 A. M. | 55–63 |
| S. S. John W. Burgess | 2:00 A. M. | Over 75 |
| S. S. J. N. Van Nuys | 2:00 A. M. | 25–38 |
| S. S. Gabriel Franchere | 2:00 A. M. | 19–31 |

4 Sec. 201, Title 46 U.S.C.A.

and an A. B. seaman and also an engine crew composed of a licensed engineer and a fireman; (b) order steam on the main engine; (c) pay out additional anchor chain; (d) drop an additional anchor; and (e) by the use of steam head up and keep the vessel's bow into the wind. In the latter operation the evidence shows that it is easier in a congested harbor to head a light ship into the wind with the anchors out than with the anchors up.

4. The liberty ships involved in the collision had two anchors, each weighing approximately 9500 pounds, with each having eight shackles, or 120 fathoms of anchor chain. Because of the size and weight of the anchor chains they are expected to sink into the mud and thus aid the anchors in holding. One of these anchors was on the port and the other on the starboard bow. They are lowered by gravity and hoisted by steam from a deck or auxiliary engine applied to winches or windlasses on the forward deck. The anchors may be dropped, but cannot be raised, without the use of the engine. Each of the four vessels involved in this suit was anchored with the port anchor and three shackles of chain in the water as directed by the harbor pilots who brought them to their anchorage.

### The Plaintiffs' Case Against S. S. Josiah Snelling

1. That the ship had only the port anchor in good working condition. The fulcrum on the windlass of the starboard anchor was broken either on April 28 or May 11, with the result that although the vessel could have dropped the starboard anchor it could not have raised it without outside assistance. The machine shop on shore repaired this broken fulcrum in five days, and if the master had sent it to the shop promptly after its disablement it would have been repaired and ready for use before the storm on the 19th and 20th. He did not send the fulcrum to the shop until the 17th of May, and it was not returned to the ship until either the 21st or 22nd of May. Without the use of its starboard anchor the ship was not seaworthy but was a menace to the other vessels or installations in the harbor. That the master knew of the defective condition of the fulcrum, the crowded conditions in the harbor, the difficulty of handling an unloaded ship, the proximity of the ship to the bridge, and should have made himself acquainted with the conditions of the weather.

2. That the mate saw bad weather making up but was unimpressed.

3. That the ship's officers were negligent in view of all the circumstances, in the absence of one of the anchors, and in view of the threatening weather, in not maintaining steam on the main engine in order to aid the one anchor in the event a blow should develop.

4. That the captain, instead of paying out more chain on the port anchor, pulled in anchor and failed to utilize sufficiently the steam when same was gotten up and turned onto the main engine.

5. That the A. B. seaman of the deck watch was asleep and was not called until about the time the ship struck the bridge.

6. No steps were taken in advance of the squall to prevent the ship from dragging anchor and inadequate steps were taken to stop it from dragging after it was discovered the ship was dragging anchor.

### The Plaintiffs' Case Against S. S. Walter Raleigh

1. One of the mates, who was the deck officer on watch, saw that the weather was threatening on the night of the storm. A deck watchman, who was not an A. B. seaman, or a part of the crew, also observed the threatening weather. Nevertheless, the mate went to bed at 12:30. He had been on duty continuously as deck watch officer since May 8, in violation of Sec. 235, Title 46, U.S.C.A.[5]

2. That there was no A. B. seaman on board or on deck watch.

---

[5] The pertinent portion of Sec. 235, Title 46 U.S.C.A., is as follows: "235. Watch duty of deck officers. * * * and no licensed officer on any ocean or coastwise vessel shall be required to do duty to exceed nine hours of any twenty-four while in port, * * *."

3. That the starboard anchor was up and secured by a devil's claw in the manner that it is secured out at sea and could not be dropped without first removing the devil's claw. [The testimony is at variance as to the time required for removing the devil's claw and no definite time can be fixed since it appears that the time consumed would depend largely upon the condition of the equipment; that is, as to whether or not the turn buckle was rusty or otherwise, and whether or not a bar was necessary to loosen it.]

4. That the master of the vessel came on board, between midnight and the time that the storm hit, in a drunken or stupid condition.

5. That he discovered the ship was dragging anchor at 1:15 but did not drop the starboard anchor until 1:30.

6. That although he ordered steam up on the main engine, he failed to use same for some fifteen minutes after the engines were made ready.

7. That the mate suggested that the starboard anchor be dropped at 1:15 but the master refused to accept the suggestion.

8. That his ship, according to its log of May 7, had dragged anchor on that date.

9. That he failed to drop the starboard anchor until his ship was practically in contact with the bridge.

### The Plaintiffs' Case Against S. S. Henry H. Blood

1. The captain was the deck officer on watch on the night of the storm.

2. The chief mate, who woke up after the storm began, ran forward and dropped the starboard anchor. He also paid out chain until he felt the ship swing and knew the anchors were holding.

3. The log of the vessel shows that the storm struck at about 1:30 and that by 1:45 the stern of the vessel was near the bridge, or, that is, close enough for the mate to see the bridge.

4. It does not appear that there was any A. B. seaman on watch or that the captain who was said to be on watch was alert to the situation. If so, an experienced mariner should have realized that the wind was of sufficient force that it was likely to cause the ship to drag anchor and should have dropped the anchor before waiting to see if it was dragging, or would drag, anchor.[6]

### The Plaintiffs' Case Against S.S. Lyman Abbott

1. That the deck log and engine room log do not agree in that the engine room log shows that the mate ordered the main engine made ready at 1:45, while the deck log states that the order was given at 1:36.

2. The master was given warning of the approach of the storm by the third assistant engineer, Anderson. The mate was given warning of the approach of the storm by third assistant engineer, Anderson, and also by Hall, an engine room wiper. That the mate refused to accede to Anderson's request to take a look at the weather but informed the wiper that he did not need any advice from the engine room.

3. Since steam was on the main engine at 1:45 and the S.S. Abbott did not strike the S.S. Blood until 1:55, ten minutes elapsed in which use might have been made of steam on the main engine if the deck log is correct.

4. That neither the master nor the mate was alert but entirely indifferent to weather conditions.

5. That the mate failed to drop anchor and to pay out chain in time to prevent the collision which could have been done

---

6 The Blood was struck by the S. S. Lyman Abbott and perhaps would not have collided with the bridge had this collision not occurred. The greatest damage done to the bridge at this point apparently was caused by the S. S. Lyman Abbott.

It is significant that the dropping of the starboard anchor and the paying out of additional chain by the mate was effective in making the ship fetch up and cease to drag, even though the ship had been allowed to drag anchor before the second anchor was used.

In the case of this vessel, as well as the others that ran into the bridge, there was a failure to use the engines until the ship had drifted too close to the bridge for the use thereof without danger of injuring the propeller.

had the deck watch paid attention to the weather or attention to the warnings of witnesses Anderson and Hall.[7]

### Defendant's Position

The defendant has denied the charges of negligence and has set up, and relies mainly upon, two defenses, namely, (1) inevitable accident and (2) act of God. It has treated these two defenses largely as if they were synonymous for it says that the suddenness and fierceness of the squall was an act of God for which it was in no wise responsible and could in no event have prevented, and in the face of which the masters and officers of its ships exercised all reasonable care and caution, and the collisions with the bridge were inevitable and unavoidable.

The two defenses are not always synonymous. Although an act of God might cause an inevitable accident, nevertheless inevitable accidents are not all caused by acts of God, but in this case the defendant's contention is merely that because of an act of God the accident was inevitable.

The defense has shown by numerous experienced and expert mariners and men of the sea that good seamanship does not require extraordinary precautionary steps every time the clouds gather or the lightning flashes and the thunder rolls; that thunderstorms and squalls, such as it insists this one appeared to be until it struck, were nothing to excite apprehension, or to demand the taking of unusual precautions. The masters and officers of the ships assert that they exercised reasonable care and caution and that there was nothing either in the heavens or on earth to indicate the ferocity and suddenness with which the squall struck. They insist that they were suddenly thrust into an emergency and thereupon used such care and caution in the emergency as a reasonably prudent person would and should have used, and that their acts or omissions in the premises must be judged by what a reasonably prudent person would have seen and anticipated before the storm and what that self same person would have done when thrust into so quick and so great an emergency. To that end these mariners have shown that the weather conditions were not such as to give reasonable grounds for apprehension, and that when the storm struck with suddenness and fury, and they found their ships were dragging anchor, they paid out more chain, or cast out another anchor, and ordered steam on the main engine, and did those things which a reasonably prudent

---

[7] There is testimony by witness Hall that he never heard or felt the starboard anchor drop. There is testimony of other witnesses that they heard the anchor being dropped after the Abbott had struck the Blood and about the time that it struck the bridge. Much of the testimony in regard to what happened is contradictory, including the vessel's logs.

The following is from the Chief Engineer's Log of the Lyman Abbott: "Between 12:30 A. M. and 1:30 A. M. Sudden gale and rainstorm 1:35 Wind increasing. 1:45 Chief Mate ordered main eng. to be made ready at once. Port boiler cut in 1:55 and steam on M. E. 2 A. M. Rocking on links, waiting orders. 2:05 from bridge St. By. 4:23 Slow Ahd. 4:41½ A. M. F. W. E. 5:23 Port Sett 10′–8″ Cut out P. Boiler"

The following is from the Deck Log of the Lyman Abbott: "1:25 slacked out more chain on Port anchor. 1:36 Noticed ship was dragging let go Stbd anchor and ordered steam on main eng. 4 shackles was let out on Stbd anchor and 3 shackles was let out on port anchor but vessel continued to drag. At 1:45 steam was ready on Main Eng. but vessel was to close to Henry A. Blood which had already dragged up to highway bridge laying to on Port quarter. It made it dangerous to use our Eng. either ahead or astern the S/S Henry A. Blood was diagonly across our bow and if we had gone astern we would have backed into bridge avoiding coming in contact with the S/S Henry A. Blood we slacked out about a shackles more on both anchors. 8 on Port 5 on Stbd. But it was impossible to clear the Henry A. Blood all together. At 1:55 the S/S Lyman Abbot stern struck the Henry A. Blood bulwark on the starboard quarter and crushed the bulwark inward, approximately over an area of about 10 ft. The Lyman Abbott came parallel alongside the highway bridge and broke railing on the bridge & light dent was observed on the Portside of the stern no other damage was observed due to darkness."

and experienced mariner would have done in the circumstances, and which their judgment dictated were the appropriate and wise things to do. None of them, however, has said that the wind was of such velocity that the ships could not have been prevented from dragging anchor but that the suddenness and velocity of the gusts were so unexpected that the usual and customary steps taken in such situations, failed to stop the ships once they had broken out anchor and had begun to drag, which, by virtue of the suddenness and unexpectedness, occurred before they, in the exercise of reasonable care and caution, could become aware that the ships were dragging. There is much evidence that establishes that the wind broke with great suddenness and violence and came in gusts that tended to jerk the anchor out of its holding ground; that because of the good holding ground and its landlocked protection it was considered an exceptionally safe harbor; that no storms had been forecast, no alarming drops of the barometer occurred; that thunderstorms and squalls were not unusual occurrences in the Pensacola Harbor, and that not only did the five ships drag against the bridge but that nine other liberty ships also dragged anchor and two ships tied to the docks broke their lines—from which defendant argues that the masters and officers of fifteen or sixteen vessels failed to anticipate a storm of such intensity or to take advance steps to prevent their vessels from dragging.

Before concluding my discussion of the factual situation I deem it appropriate now to ascertain and to announce certain pertinent legal aspects of this case.

## Conclusions of Law

The law of averages cannot be made the criterion of liability here. The fact that fourteen dragged anchor and seven did not and that only five of the vessels collided with the bridge, are circumstances to be taken into consideration, but each tub must stand on its own bottom—each vessel must show that it exercised proper care under the circumstances, and this case will be determined by what was due care under the circumstances. If the masters of these vessels were merely required to exercise ordinary or reasonable care after the officers of the vessels discovered their peril, then the defendant would doubtless be entitled to a judgment in its favor. We, therefore, must determine what was the degree of caution and care which the circumstances demanded of the masters of these vessels.

Let us epitomize the circumstances:

1. A harbor filled with forty ships, twenty-one of which were liberty ships anchored in the harbor rather than moored to the dock.

2. All twenty-one of these liberty ships were light and without cargo or ballast.

3. All of these ships had only one anchor out and three shackles of chain in the water.

4. All of these ships had a large portion of the rudder and some of the propeller above the water, with a consequential loss of maneuverability.

5. It is universally known to mariners that an unloaded vessel is much more difficult to maneuver or to handle in a storm than a loaded vessel.

6. A coal tipple and several docks and shore installations projected into the deep water of the harbor.

7. The highway bridge traversed the entire eastern side of the harbor.

8. Threatening weather was on the horizon.

The term "safe harbor" or "safe anchorage" at Pensacola was a relative term and by no means absolute.

A master of any of these vessels should have not only sought to avoid collisions with the bridge and the docks and the vessels, but also endeavored to prevent the crossing and entanglement of its anchors with the anchors and chains of other vessels.

The threat of an approaching storm on a loaded vessel at open sea is a matter of small moment in comparison to the threat of an approaching squall to a harbor full of light liberty vessels at anchor. In the former the master is concerned only with the safety of his vessel, its cargo, and its

500

crew; but in the latter he must concern himself also with the danger that his vessel might cause to the lives and property of others in that area.

█ It was the duty of the masters of these vessels to know and to understand their responsibility in the situation that they were in on the occasion in question. Ordinary care or reasonable care was not the test, but a very high degree of care and caution was required under the circumstances present at the time.

█ Before going further into these conclusions it is appropriate that we give consideration to the question of the burden of proof. I think this burden is on the defendant whenever it pleads in defense either inevitable accident or act of God. See Gleeson v. Virginia Midland Railway Company, 140 U.S. 435, text 444, 11 S.Ct. 859, 35 L.Ed. 458; Atlantic Coast Line R. Co. v. Hendry, 112 Fla. 391, 150 So. 598.

█ The fact that one hits and damages an immovable object with a movable one demands that the operator of the movable object be required to exculpate himself. The bridge did not hit the ships and the doctrine of res ipsa loquitur is applicable in this case and will serve to supply an inference of the lack of due care in the absence of explanation by defendant. See Orme v. Burr, 157 Fla. 378, 25 So.2d 870.

█ Moreover, the defendant must show that the collisions occurred wholly through the act of God and entirely without fault or negligence on the part of its agents. Under the Federal Tort Claims Act we must be guided by the known and applicable principles of law of the State of Florida. We note that the Supreme Court of Florida, in Atlantic Coast Line R. Co. v. Hendry, 112 Fla. 391, 150 So. 598, said:

"The defense of vis major may be successfully interposed in an action for damages resulting solely from an act of God; but if the defendant's negligence is a present contributing proximate cause, which, commingled with the act of God, produces the injury, then the defendant is liable notwithstanding the act of God. Davis v. Ivey, 93 Fla. 387, 112 So. 264; Case note 29 L.R.A.,N.S., 663; Case note 42 L.R.A., N.S., 709.

"The burden is on the defendant who interposes the defense of vis major to show that the damages resulted solely from the act of God and that it contributed in no way thereto."

█ The defendant has not discharged that burden in this case. It must be kept in mind that it was not the storm that knocked holes in the bridge but it was the vessels, the property of the defendant. In United States v. Bruce Dry Dock Company, 65 F.2d 938, 939, the Fifth Circuit, in dealing with a question of liability of a vessel of the United States for damage caused to a dry dock by one of its vessels which broke loose from its moorings during a hurricane, said: "It is argued on behalf of appellant that the hurricane was the efficient cause of the damage. But appellant is not entitled to take that position in the absence of a showing that the master and crew took every reasonable precaution to prevent the damage that was done."

█ The maxim of the common law that one must use his own property so as not to injure that of another—sic utere tuo ut alienum non laedas—is particularly applicable here and when property having mobility belonging to one person, runs into immobile property of another, there arises a strong inference of the failure to use due care on the part of the owner of the property possessing the power of locomotion. See Eagle Oil Transport Company, Ltd., v. Bowers Southern Dredging Company, 5 Cir., 255 F. 52, 53 wherein our Court of Appeals said: "The collision in question being one between a moving vessel and an anchored pipe line, the location of which was known, there is a presumption of fault on the part of the moving vessel. (Citing cases.)"

I hold, therefore, that the defendant had the burden of showing itself to be free from the commission or omission of any act that proximately contributed to the injury and that if it has failed so to do the defenses of inevitable accident and vis major must fall. See: The George W. Peavey, 2 Cir., 183 F. 571, 106 C.C.A. 117,

affirming D.C.1909, 173 F. 715; The Pennsylvania, 24 How. 307, 65 U.S. 307, 16 L. Ed. 699; The Newa, 4 Cir., 267 F. 115, affirming D.C.1919, The Djerissa, D.C., 258 F. 949; The Baltic, Fed.Cas.No.823, 2 Ben. 452; Southern Ry. v. U. S., 45 Ct.Cl. 322; The David Dows, D.C., 16 F. 154; The Edmund Moran, 2 Cir., 180 F. 700, 104 C.C. A. 552, affirming D.C.1909, 173 F. 109; The Old Reliable, 3 Cir., 269 F. 725; Brown v. Kendall, 6 Cush. 292, 296, 60 Mass. 292, 296; San Pedro L. A. & S. L. R. Co. v. U. S., 9 Cir., 220 F. 737, 744.

In The Drumcraig, D.C., 133 F. 804, it is said: "An inevitable accident is something that human skill and foresight could not, in the exercise of ordinary prudence, have provided against. * * * I think it is shown by a fair preponderance of the evidence that the storm, although a violent one, gave sufficient warning of its approach to have made it the duty of the master of the Loch Trool to put out more fastening lines before the ship broke from her moorings, and the failure to do this constitutes negligence for which the Loch Trool must respond in damages." See The Terje Viken (The Baravia), 212 F. 1020, 1021. See also The British Isles, 2 Cir., 264 F. 318; The Louisiana, 3 Wall. 164, 174, 18 L. Ed. 85.

A case very much in point is United States v. South Carolina Highway Department, 4 Cir., 171 F.2d 893, in that a vessel belonging to the United States was caused by a sudden squall to drag another and to collide with a highway bridge of the South Carolina Highway Department. As in the present case there were no storm warnings and the squall came up suddenly, having a velocity of approximately 60 miles per hour. The liberty vessel, which was light, dragged anchor, and the only thing done to prevent the collision with the bridge was the dropping of the starboard anchor shortly before collision. In that case it was shown that the night mate had gone on watch and remained on duty from the time he went on board the vessel at 5 P.M. Friday until the collision, about 4 o'clock Sunday afternoon. The District Court held, 78 F.Supp. 598, 603 that the master who had allowed this violation of Sec. 235, Title 46 U.S.C.A., had the burden of showing that this violation of the law not only "probably did not but that it could not have" contributed to the collision. It will be recalled that Bays, the third mate on the Raleigh, began his deck watch on May 8, 1945, and had been on watch continuously from May 8 until after the storm on May 20, and that notwithstanding that he was on watch he was in bed at 12:35 on the night of the storm and did not awaken until about 1:15, or after the storm had arrived. The Court in that case also held that "where a drifting ship collides with an object which is in no way at fault, the ship must show affirmatively that this drifting was the result of inevitable accident which human skill and precaution could not have prevented. The Louisiana, 3 Wall. 164, 70 U.S. 164, 18 L.Ed. 85; [8] The Newa, 4 Cir., 267 F. 115." This case was affirmed by the Fourth Circuit in an opinion found at 171 F.2d 893.

Citations could be multiplied indefinitely to the effect that one cannot plead inevitable accident or act of God if it lay within his power to have prevented the accident by the exercise of human foresight, care, and caution, but to cite more of them seems unnecessary in view of the holdings of the Supreme Courts of both the State of Florida and the United States.

### Further Findings of Facts

It was demonstrated that six or seven of the vessels in the same harbor did prevent their vessels from dragging anchor. It was shown that sixteen of the vessels did not collide with the bridge. This showing, al-

---

[8] In the cited case the Court said:

"The steamer Flushing being aground on Hampton Bar, out of the channel or course of vessels navigating the bay or harbor, and incapable of motion, cannot be justly charged with any participation in causing the collision.

"The collision being caused by the Louisiana drifting from her moorings, she must be liable for the damages consequent thereon, unless she can show affirmatively that the drifting was the result of inevitable accident, or a vis major, which human skill and precaution, and a proper display of nautical skill could not have prevented."

though not positive proof, is a strong argument for the inference that the four vessels could also have been prevented from crashing into the bridge by the exercise of due care, caution, and foresight. The facts and circumstances pointing to fault on the part of the masters of the four vessels will not be again set out, but it seems to me that the failure to heed the warnings that the vivid lightning wrote in the boiling clouds gathering in the southwest, and to pay any attention thereto until the vessels were already adrift; the waiting by those weather-wise mariners after the storm broke upon them and the wasting of precious moments seeking to tell if their ships were drifting rather than the taking of prompt measures to prevent their beginning to drift; the allowing of the A. B. seaman on watch to go to sleep; and the keeping of a mate on continuous watch from May 8 to May 20 and permitting him to go to bed at 12 o'clock on the night of the storm and to be awakened only by the storm's fury; the failure to have the fulcrum on the windlass of the starboard anchor of the Snelling fixed and replaced promptly; the failure to pay out more chain and to drop additional anchors; the failure to utilize steam seasonably; the declination of master and mate to heed the warnings of the nervous and storm-conscious Anderson and Hall; the inebriacy and consequent stupidity of Captain Blomberg, as unwillingly revealed by the defendant's own witness; all in the face of the knowledge: (a) that these unloaded ships were difficult to handle in a storm; (b) of the presence in the harbor of so many unloaded vessels in reasonable proximity to the bridge and the shore installations; exemplify a failure to exercise that degree of care which the circumstances required; and while all of these faults were not present on each and every vessel, it cannot be said that any of the four acted with that degree of care and caution that the circumstances required. To say the least, they each failed to discharge the burden of proof which the law cast upon them to show that despite the vis major human skill and precaution or a proper display of nautical skill could not have prevented the collisions.

The judgment of the Court is against the defendant for the damages as stipulated, for the cost of the repairs as well as the construction of the detours, and the removal thereof, less the salvage value thereof; less the engineering, administrative, and overhead costs, to wit:

| | | |
|---|---:|---:|
| Total damages by S. S. Josiah | | |
| Snelling at Point 2 | $ 14,442.85 | |
| Less engineering costs, etc. | 737.85 | $ 13,705.00 |
| Total damages by S. S. Walter | | |
| Raleigh at Point 3 | $151,238.61 | |
| less engineering costs, etc. | 7,485.34 | 143,753.27 |
| Total damages by S. S. Lyman | | |
| Abbott and S. S. Henry H. | | |
| Blood at Point 4 | $ 79,697.43 | |
| Less engineering costs, etc. | 3,944.51 | $ 75,752.92 |
| Constructing and tearing away | | |
| bridges (detour), less salvage value | $146,037.02 | |
| Less overhead, etc. | 17,610.63 | $128,426.39 |
| Total amount to be recovered | | $361,637.58 |

The Court is of the opinion that the plaintiffs would have been entitled to recover for the securing of the engineering data, the drafting of plans and specifications for repairs, as well as the engineering supervision of the project, or, that is, the cost of the engineers directly engaged in the actual preparation of essential plans and specifications and in actual supervision of the repairs to the bridge, had these expenses been agreed upon or proven, but that the departmental engineering charges, administrative expenses, and overhead allocated by the Department to the repair of the bridge in the proportion that the cost of the repair bore to the total expenditures of the Department for the year does not properly measure the damages which may be recovered against one who has damaged only one bridge out of the many projects of the Road Department in the State during the time the repairs were being undergone. In other words, even though the engineering charges, administrative costs, and overhead allocated to the repair of this bridge do not appear to the Court to be unreasonable, nevertheless the system of the Road Department of allocating the expenses of each project in proportion to the total expenditure of the Department throughout the whole state during the year furnishes no proof that all

of the other similar projects against which expenses were allocated were also reasonable and proper.

In concluding this opinion I wish to express to counsel my deep appreciation of the full, fair, cooperative, thorough, and able manner in which counsel for the parties have presented this case.

Let a judgment be prepared and submitted in accordance with the foregoing and in due regard to the directions given by the Court of Appeals as to the form of the judgment as to the subrogee in U.S. v. Hill et al., 5 Cir., 174 F.2d 61, text page 62.